[No. 7126.]

COLORADO MORTGAGE & INVESTMENT CO., LTD. v. GIACOMINI.

1. LANDLORD—*Liability for Condition of Premises*—Where premises leased for public or semi-public purposes, are not, at the time, in safe condition for the purposes contemplated in the letting, or there exists upon the premises a dangerous thing or condition in the nature of a nuisance, and the owner knows, or by due diligence ought to have known of such condition, he is liable to third persons for injuries afterwards resulting from the continuance of such condition, and this without reference to the stipulations between the landlord and tenant, the landlord's liability being based upon his own misconduct in the premises.

2. ——*Public Place*—A hotel is a semi-public place, within the meaning of the rule, and one who leases for this purpose a building containing a passenger elevator intended for the use of the guests, which, as he knows, or by due diligence would know is at the time in defective condition, and so continues until, by reason of such defect, a guest, without fault on her part, is injured, is liable to respond in damages to the guest; and this even though the accident results partly from the defective condition of the elevator, and partly from the negligence of the lessee in the manner of its operation.

3. NEGLIGENCE—*Concurring Negligence of Several*—Where an injury is the result of the negligence of the defendant and the concurring negligence or wrongful act of another, for which neither plaintiff nor defendant is responsible, the defendant is liable where the injury would not have occurred but for his negligence.

4. ——*Unforseen Results*—Defendant leased a four story building to be used as a hotel. It contained a passenger elevator, intended for the use of those who should patronize the establishment. The elevator was unlighted, contained no arrangement for lighting, was

in an insufficiently lighted place, and was in such defective condition that it would "creep," or, without human intervention would move away from the place where it was stopped. All this the defendant, at the time of the letting, knew, or by due diligence would have known. A guest of the hotel, having shortly before descended from her room, was returning, and the elevator door being open, she supposing the car to be still standing where she had left it, and the pilot to be within, stepped through the door and fell to the basement receiving serious injuries. In fact the car had "crept," so as to be above her head, and the pilot who also acted as bell-boy was absent in this capacity. The door was left open according to the usage of the service, because, when closed the door was locked, and the pilot was not provided with a key. It was contended that the defendant was not bound to anticipate that the tenant would permit the elevator service to be conducted in this negligent and dangerous manner; that he was entitled to assume the contrary, and therefor was not chargeable. This contention was repelled, the court being of the opinion that the landlord was not at liberty to assume that the door of the elevator shaft would be always closed when the pilot was not within the car; that the contrary ought to have been anticipated; and the court said that what is reasonably to be anticipated, in such case, is not that the particular injury will result, but that some such disaster will occur in the long run.

*Appeal from Denver District Court.*—Hon. HARRY C. RIDDLE, Judge.

Mr. WILLIAM J. MILES, for Appellant.

Messrs. ALLEN & WEBSTER, for Appellee.

This action was instituted by the appellee against P. W. Copeland and the appellant to recover damages sustained by her upon June 27th, 1908, occasioned by her falling down the elevator shaft in The Columbia Hotel, situate in the city of Denver. It is alleged that the accident was caused by the negligence of the defendants in permitting the elevator and appurtenances thereto to be and remain out of repair. Judgment was in her favor against both defendants in the sum of $10,000. The appellant brings the case here on appeal.

The appellant was the owner of the hotel, its furniture and fixtures. It was being operated under a written

lease by its co-defendant, P. W. Copeland. This lease was for the term of one year, commencing November 1, 1907. It calls for the Columbia Hotel situate on the corner of Seventeenth and Market Streets, East Denver, together with the furniture, fixtures, machinery, cooking utensils, beds, bedding, etc., as enumerated in a schedule, excepting from the lease certain storerooms fronting on Seventeenth Street occupied by others. The lease indicates that the property was rented fully furnished for a hotel. It provided, that the lessor should not be required to bear any expenses for supplies of any kind nor for heating, lighting or repairing, nor for repairs to furniture, fixtures or utensils, nor for any other purposes except taxes, insurance, and water rent; that the lessee would keep the elevator and all other machinery in good order, and, in addition to the rent, pay to the first party annually, when due, one-half the costs of accident insurance policies, covering accidents in connection with the elevator; that the lessor reserved the right at all times to enter and inspect the premises, and if, in its judgment, the premises, furniture, fixtures, machinery and all other equipments were not being properly cared for, or the business not being managed in a manner satisfactory, it had the right to terminate the lease by giving ten days notice previous to the end of any calendar month; that the lessee agreed to keep the interior of the hotel in repair and good order, including all articles therein, and in case the articles should wear out, become broken or damaged, to replace them; that all articles placed in the hotel in replacement of any mentioned in the schedule should be the property of the lessor; that if the property became untenantable by reason of fire, or otherwise, the rents should cease until the premises were rebuilt, but nothing should be construed to compel the lessor to build or repair in case of destruction unless it so desired. Another clause reads,

"It is agreed by the parties hereto that all expenses for repairs to boilers, elevators or pumps shall be borne equally by both." It is shown that at the time of the accident the appellant had a $5,000 insurance policy in force protecting it against accidents caused by this elevator.

The hotel fronts upon Seventeenth street, one of the main thoroughfares of the city between the Union Depot and the main portion of the business district, being about three blocks from the depot. It has four stories and a basement and contains about one hundred sleeping rooms. The elevator is situate in the main office or lobby about thirty feet from the front entrance. It is back of the business office. There is a porch in front of this room. The light in the day time comes from the front of this room, and that which reflects down from the fourth story of the building, through a skylight in the top of the elevator shaft. The elevator cage has a top or tight roof. Upon account of these facts the light in that portion of this room is not good, and is always poor in the elevator shaft at this floor. One former employe testified, "To be able to see around and see what you are doing the lights have to be lit in the office, in the afternoon. * * * If it was not a bright day and the lights were not lit it was almost impossible at that time of day to read a name on a package while in the elevator at that floor." Another witness says "Never light enough in the elevator to read a newspaper." There were no lights lit at the time of the accident. According to the evidence of the plaintiff's witnesses the elevator was out of repair at the time of the execution of the lease, and thus continued up to the time of the accident. The printed abstract of the record is so meager that it is nearly impossible to get an intelligent idea of the condition of the elevator therefrom, but, as we understand it, the substance of these defects was in its ma-

chinery which caused leaking of the cups in the main valves, or the packing in the piston leaking, or a wearing of the cups or the valves; some of which created a rumbling noise, and that upon account of these defects the elevator cage, after being properly stopped, when left alone, would creep (that is move slowly), upon account of its leaky condition, in order to counteract the leaking in the cups, valves or piston. The ceiling of the elevator cage had originally been fitted for an electric light, but prior to the execution of this lease it had been dismantled, or disconnected, so that there was no wire connecting it with the light plant. It was impossible, without having this condition repaired, to have an electric light within the cage. There was evidence to show that all these conditions were in existence at the time of the execution of this lease, and were known, or, in the exercise of reasonable care ought to have been known to the lessor, and to the lessee at that time or soon thereafter, but regardless of this they were allowed to thus continue up to the time of the accident.

Upon June 26th, 1908, the appellee (who lives at Sterling, Colorado,) came to Denver with her mother. They stopped at this hotel, where she was assigned to a room upon the second floor. Between four and five o'clock upon the afternoon of June 27th the elevator boy came to the second floor and informed her that she was wanted at the telephone, which was situate upon the ground floor. She went to the elevator and was taken, by the boy who carried the message, to the first floor, where, upon leaving the elevator, she immediately went to the telephone booth, and conducted a very short conversation with her brother, who was holding the line. She immediately went back to the elevator to be taken to the second floor. Finding the door open and it being, as she says "quite shadowy there" she assumed that the elevator was as she had left it but a moment or two be-

fore, and walked into what proved to be vacant space, falling to the cement basement about twelve feet below, and receiving serious and permanent injuries for which the damages were awarded.

The young man in charge of the elevator testified, that before bringing the plaintiff down he had received a call for drinks to be secured at the bar; that after stopping the elevator at the first floor, when the plaintiff got out, he heard a bell ring, and, presuming it was a second call for the drinks, he followed her out of the elevator, going to the bar to get the drinks, intending to return at once, which he did; that he thinks he left the door of the elevator open; that the drinks were immediately furnished him, but just as he came out of the bar into the main office where the elevator was situate, he observed the plaintiff entering the door, and saw her fall. She also testified, that her eyesight was not perfect, although reasonably good for all ordinary purposes; that she was then twenty-eight years old; that when she returned to the elevator she found the door open, looked in and thought that the elevator was standing there, and that the pilot was inside, but did not make an investigation to establish this latter fact before entering. At the time she entered the door, according to the testimony of her witnesses, the elevator cage, upon account of its defective condition, had crept upwards and the bottom of the cage was then some six or seven feet higher than this floor. She was between five feet two inches and five feet five inches in height, and did not come in contact with the cage when she entered the door. The elevator boy testified that the duties allotted to him by Mr. Copeland were not limited to running the elevator, but he was required to answer bell calls, carry water to the rooms, drinks etc. and otherwise to wait upon the guests; that these latter duties were not usually required of elevator boys in hotels where he had formerly worked; that there

was a lock to the door of the elevator shaft upon this floor, but he did not have a key to it; that he usually left the elevator doors open when answering calls; that in case he closed this door it became fastened and it was then necessary to get a knife, blotter or some other narrow instrument and slip it through the crack, and raise the latch, and the door could then be pushed open from the outside. Mr. Copeland testified, that the duties required of his elevator pilots were not limited to running the elevator, but that they were required to perform certain other services usually belonging to bellboys.

Mr. Justice Hill delivered the opinion of the court:

The assignments of error present two questions: first, whether under the facts disclosed the appellant can in any event be held liable for the damages to the plaintiff occasioned in whole, or in part, by the defective condition of the elevator; and second, if so, was its defective condition the proximate cause of the injury?

We have been furnished with many citations of authorities upon the first question. The conflict among some of them cannot be reconciled. The great mass of the cases appears to recognize certain well defined legal principles. The first is, that as between the landlord and tenant, when there is no fraud, or false representations, or deceit and in the absence of an express warranty or covenant to repair, there is no implied contract that the premises are suitable or fit for habitation, or for the particular use intended, or that they are safe for use, or that they shall continue fit for the purposes for which they were demised. These general rules have been recognized and followed in this jurisdiction.—*Davidson v. Fischer,* 11 Colo. 583, 19 Pac. 652, 7 Am. St. Rep. 267; *Thum v. Rhodes,* 12 Colo. App. 245, 55 Pac. 264. There are certain exceptions, however, to the rule exempting the owner from liability for injuries to third persons caused by defective conditions in leased premises. The

cases, recognizing the exceptions hold, that where the property is leased for public or semipublic purposes, and at the time is not safe for the purposes intended, or when there is a dangerous condition on the premises which is in the nature of a nuisance, and the owner knew, or, by the exercise of reasonable diligence, ought to have known of such conditions, he cannot evade liability to a third person for damages resulting from such conditions, but it is his duty to make such property reasonably safe for the purposes intended, or to discontinue the conditions which are in the nature of a nuisance, as the case may be.

In *Stenberg v. Willcox,* 96 Tenn., 163, 33 S. W. 917, 34 L. R. A. 615, it was held,

"Where unsafe premises are leased, to be used as a boarding house the lessor, if he knew the unsafe condition of the premises, or could have known it by the exercise of reasonable care and diligence, is liable to the lessee's guest or boarder who has sustained personal injuries as the result of such unsafe condition of the premises."

The injury was occasioned by the falling of a defective back porch. It appears that the lessee knew the condition of the porch at the time he rented the premises and claimed that the lessor promised to put it in good repair. However, the case was disposed of upon the theory that where the landlord leased premises in a dangerous and unsafe condition, when he knew, or, by the exercise of reasonable diligence and care, might have known of such unsafe condition, and the boarder did not know of such unsafe condition, and could not have known of it by the exercise of reasonable diligence and care, the landlord was liable, and not upon any contract relations between the landlord and tenant of which the boarder may have known nothing and to which she was not a party. The contention was made, that the tenant

alone should be held liable; that if the plaintiff was a guest or boarder of the tenant, then the tenant and not the owner must be held liable for such injuries, even though the defect existed when the lease was made, on the theory that such person would never have suffered injury from the defects if she had not entered the premises, and such entry was not made at either the request or invitation of the owner, but upon the invitation of the tenant, who held himself out to the public as the keeper of a boarding or lodging house. In response to this argument the writer of the opinion, at page 165, 33 S. W. 917, 34 L. R. A. 615, says:

"The language is substantially the same as in Sherman & Red. on Negligence, section 711; but the same author says, in the same section: 'If the landlord lets the premises for a purpose which he knows, or ought to know, it to be unfit for, knowing that strangers will be invited there, it has been held that he is liable to them.' And the same author says, section 709: 'Even the entire surrender of control by the landlord does not relieve him from liability to third persons for defects which existed in the premises when he parted with the control, not even if the tenant had agreed to make repairs,' etc.

It clearly appears by the proof in this case that the defendant knew the premises were to be used as a boarding house, recommended it for this purpose, and urged its location near the Union Depot as a desirable feature for this purpose." This matter was again gone over by the supreme court of Tennessee in *Willcox v. Hines,* 100 Tenn., 524, 45 S. W. 781, 66 Am. St. 761, where this same doctrine was again approved and many cases cited in support of their former position.

In *Copley v. Balle,* 9 Kans. App., 465, 60 Pac. 656, it was held that the owner of property having a dangerous excavation thereon known to him when he leased it to another, to be run as a hotel and restaurant, without

making reasonable provision for the protection of its patrons from falling into said excavation, is liable for the damages resulting therefrom. At page 467, 60 Pac. 656, the court said:

"The evidence in this case warranted the jury in finding that the plaintiff in error was negligent in leasing the property to be used for a public purpose without providing for the protection of patrons from the danger of injuries by reason of the excavation thereon."

As authority for this statement the court cites *Edwards v. N. Y. & H. R. Co.*, 98 N. Y., 245, 50 Am. Rep. 659, which is a leading case upon this subject; in which, after announcing the doctrine heretofore recognized, the court said:

"Therefore, if any responsibility in this case attaches to the defendant, it cannot be based upon any contract obligation, but must rest entirely upon its *delictum*. If a landlord lets premises and agrees to keep them in repair, and he fails to do so, in consequence of which any one lawfully upon the premises suffers injury, he is responsible for his own negligence to the party injured. If he demises premises knowing that they are dangerous and unfit for the use for which they are hired, and fails to disclose their condition, he is guilty of negligence which will in many cases impose responsibility upon him. If he creates a nuisance upon his premises, and then demises them, he remains liable for the consequences of the nuisance as the creator thereof, and his tenant is also liable for the continuance of the same nuisance. But where the landlord has created no nuisance, and is guilty of no willful wrong or fraud or culpable negligence, no case can be found imposing any liability upon him for any injury suffered by any person occupying or going upon the premises during the term of the demise; and there is no distinction stated in any authority between cases of a demise of dwelling-houses and of buildings to be

used for public purposes. The responsibility of the land-lord is the same in all cases. If guilty of negligence or other *delictum* which leads directly to the accident and wrong complained of, he is liable; if not so guilty, no liability attaches to him. If he lets a building for a warehouse, knowing that it is so weak and imperfectly constructed that the floors will break down from the weight necessarily to be placed upon them, his negligence imposes liability upon him for injury to the person or property of any one who may lawfully be upon the prem-ises using them for the purposes for which they were demised. If one builds a house for public amusements or entertainments, and lets it for those purposes, know-ing that it is so imperfectly and carelessly built that it is liable to go to pieces in the ordinary use for which it was designed, he is liable to the persons injured through his carelessness. And this rule of responsibility goes far enough for the protection of lessees and of the public generally. * * * It imposes liability upon the land-lord for his *delictum,* and the tenant is also liable, not only for his negligence, but also upon the authority of the case of *Francis v. Cockrell,* by virtue of an implied con-tract which he makes with all the persons whom, for a compensation, he invites or induces to enter his build-ing to witness public entertainments given therein by him or under his supervision.''

In this case the building was leased for public ex-hibitions; held, that the lessee had changed the condi-tions under which it was expected by the lessor that it would be managed, for which reason he was not liable, but had it been used for the purposes and in the manner contemplated under the terms of the contract, and it was then demonstrated that it was unfit for these purposes, he would have been held for the damages sustained. Four members of the court were of the opinion that he should be held under conditions as disclosed.

In *Reichenbacher v. Pahmeyer,* 8 Ill. App., 217, it was held, that when a landlord rents premises in a ruinous and dangerous condition and an injury results therefrom to a third person, the landlord is liable; that suffering premises to be constructed or to become in a dangerous and unsafe condition is a nuisance, and if the landlord demises the premises in that condition, he is liable for injuries resulting therefrom to third persons lawfully upon the premises. In this case the owner leased a building for a hotel in which was a public barroom. The chandelier in the barroom was in a defective and dangerous condition, known to the landlord at the time of the execution of the lease, but was not apparent to an observer. The plaintiff, an employe of the lessee, was injured by the falling of this chandelier. The court, at page 218, said:

"A nuisance is anything that unlawfully worketh hurt, inconvenience or damage. 3 Bl. Com. 216, and it may result from nonfeasance or negligence as well as from misfeasance or malfeasance: Wood on Nuisances chap. 1. It is said in Shearman & Redfield on Negligence, sec. 56: 'The rule seems to be that if the injury results from the negligence of the owner either in constructing or upholding the property, he is responsible, but that he is not in general responsible for the negligence of the tenant in the use of the house.' Wharton on Negligence, sec. 727 *a,* and Wood on Nuisances, sec. 141. It is also, no doubt, true that in the leasing of premises there is no implied warranty that they are fit for a particular use, and that liability, if any, in this class of cases does not spring from contract but must be predicated upon the negligent act or omission of the landlord, the same being the proximate cause of the injury, in reference to a matter where it was his duty to use ordinary care out of respect to the rights of others liable to be thereby directly involved, and for an injury thus arising a re-

covery may be had where there is no such contributory negligence on the part of the plaintiff as would bar the remedy in other actions for negligence.''

In *Godley v. Hagerty*, 20 Penn. St., 387, 59 Am. Dec. 731, the owner of a building erected for rent had constructed it so imperfectly that it was incapable of supporting the burden imposed upon it by the business for which it was intended; it suddenly fell, injuring a laborer employed by the lessee through no carelessness of his. The owner was held for the damages sustained.

In *Swords v. Edgar et al.*, 59 N. Y., 28, 17 Am. Rep. 295, the owner of a pier leased it while in an unsafe condition. During the continuance of the lease the plaintiff's intestate, who, by reason of his occupation, was lawfully using the pier, was injured by the pier giving away upon account of its defective construction. The owner was held liable. After an exhaustive review of the authorities it was said, that suffering the pier to be in such a state as to become dangerous to those lawfully using it, was the creation of a nuisance and the lessor was liable if he created the nuisance and demised the premises in that condition and was receiving a benefit therefrom in the way of rent, or otherwise, at the time of the injury.

In *Todd v. Flight*, 99 English Common Law Reports, 377, it was held that if the landlord rented premises in a ruinous and dangerous condition resulting in an injury to a third person, he must respond. After examining and analyzing a number of cases, the court said:

''These cases are authorities for saying, that, if the wrong causing the damage arises from the non-feasance or the mis-feasance of the lessor, the party suffering damage from the wrong may sue him. And we are of opinion that the principle so contended for on behalf of the plaintiff is the law, and that it reconciles the cases.''

In *Nugent v. The B. C. and M. Railroad*, 80 Me., 62, 12 Atl. 797, 6 Am. St. 151, damages were awarded to a railroad brakeman, an employe of the lessee, for personal injuries occasioned by reason of the negligent construction of the lessor's station-house which was then in the possession of the lessee. The owner attempted there, as here, to defend upon account of its lease. The plea was held not well taken. The opinion states that the common law imposed upon the lessor a duty to the public, independent of contract, and coextensive with its lawful use, to keep its road and its appurtenances in a reasonably safe and proper condition. It is also said that the action was *ex delicto* for an injury caused by a neglect of duty created by law, and that privity is not essential to the maintenance of an action of tort therefor. At page 77 the court said:

"We are also of opinion that the defendant is liable, under the rule which governs the responsibility of a lessor of demised premises, for their condition. For it is settled law, that when the owner lets premises which are in a condition which is unsafe for the avowed purpose for which they are let, or with a nuisance upon them when let, and receives rent therefor, he is liable, whether in or out of possession, for the injuries which result from their state of insecurity, to persons lawfully upon them; for by the letting for profit, he authorizes a continuance of the condition they were in when he let them, and is therefore guilty of a nonfeasance."

Numerous cases are cited to support this position when applied to a private nuisance, or a semipublic place.

In *Joyce v. Martin*, 15 R. I., 558, 10 Atl. 620, defendant was the owner of a defective wharf which was used in connection with a place of public resort. He leased both, knowing the defect, to his codefendant who was then ignorant of it, but who continued to use both

after learning about it. In an action for damages to the plaintiff, who had been injured by the defect, it was held that the lessor and lessee were jointly liable. This case likewise cites many authorities to support its conclusion.

In *Albert v. State,* 66 Md., 325, 7 Atl. 697, 59 Am.. Rep. 159, the action was by a minor for damages sustained by him by the death of his parents who were drowned by reason of the defectiveness of a wharf in possession of the defendant's tenant. The instruction complained of was "that if they found that the defendant was the owner of the wharf, and that he rented it out to a tenant, and *that at the time of the renting,* the wharf was unsafe, and *defendant knew, or by the exercise or reasonable diligence* could have known, of its unsafe condition, and that the accident happened in consequence of such condition, the plaintiff was entitled to recover." The instruction was held good. The court cited *Owings v. Jones,* 9 Md., 108, where the following rule was approved, "Where the owner leases premises which are a nuisance, or must in the nature of things become so by their user, and receives rent, then, whether in or out of possession, he is liable for injuries resulting from such nuisance." Continuing, on page 337 the court said:

"A wharf, furnishing the only mode of ingress and egress to a summer resort, where crowds were invited to come, if in an unsafe and dangerous condition is certainly a nuisance of the worst character. It will not do for the owner, knowing its condition, or having by the exercise of any reasonable care the means of knowing it, to rent it out and receive rent for it, but escape all liability when the crash comes. He who solicits and invites the public to his resorts, must have them in a reasonably safe condition, and not in a condition to risk the lives and limbs of his visitors."

In *Patterson v. Jos. Schlitz Brewing Co.,* 16 S. D., 33,

91 N. W. 336, it was held that 'the owner of a building who negligently allows it to become a nuisance before he leases it, is liable for injury to an employe of the tenant from its fall after he leases it, though he does not covenant in the lease to repair, and in such case it is immaterial whether it was leased for a dwelling or otherwise.' With reference to the liability of the owner for injuries to person caused by defective and unsafe buildings, at page 45, the court said:

"The following rule may be regarded as settled: If when let, the premises are in a condition dangerous to the public, or with a nuisance thereon, the owner may be liable to strangers for the injuries resulting from such condition or nuisance if he had notice of the dangerous condition of the building, or could, by the exercise of ordinary care and diligence, have ascertained its dangerous condition. By renting the premises and receiving rent therefor he is to be regarded as authorizing the continuance of the nuisance."

This principle is recognized and stated in *Metzger v. Schultz,* 16 Ind. App., 454, 43 N. E. 886, 45 H. E. 619, 59 Am. St. 323, where it is said:

"It is also the general rule that the occupier of lands is *prima facie* responsible for any nuisance maintained thereon, and not the owner. But to this rule there are several well defined exceptions. The owner is responsible if he creates a nuisance and maintains it. He is responsible if he creates a nuisance and then demises the premises with the nuisance thereon, although he is out of possession. He is liable if a nuisance was erected on the land by a prior owner or by a stranger, and he knowingly maintains or continues it. He is liable if he demised the premises and covenanted to keep them in repair, and omits to repair, thereby creating a nuisance. He is liable if he demise the premises to be used as a nuisance, or to be used in any way so that a nuisance

will necessarily be created. * * * If a landlord demise his property, the law requires him to know its condition at the time he accepts a tenant. The rights of others are frequently involved by the condition in which the premises are maintained. Any person who conducts upon his premises any dangerous business, or has thereon any dangerous machinery or substance, not in themselves unlawful, is in duty bound to exercise reasonable care and vigilance to see that no harm comes to others in consequence thereof. But the landlord is not an insurer. There are many businesses, machinery, and appliances not nuisances, *per se,* that are attended with danger. When the landlord has exercised reasonable care in respect thereto, he is exonerated from liability."

The same rule is recognized in *Burner v. Higman & Skinner Co.,* 127 Iowa, 580, 103 N. W. 802, which involved liability in the operation of a freight elevator. At page 588 the court said:

"As this was a freight elevator, they were not bound to the highest degree of care, but were required to use ordinary and reasonable care in protecting and lighting this elevator well or shaft, so that persons rightfully upon the premises might not be injured thereby. Had they retained no control over the elevator, there would have been no liability, in the absence of a showing that at the time they leased the premises there was a nuisance, of which they had knowledge, and which it was their duty to abate. But as landlords they had the right to lease their premises in their then condition, and there was no covenant, either express or implied, to repair, or to keep the premises free from danger, except to the public in general. They could not, of course, by leasing the premises, absolve themselves from any duty they owed to the public; but, as to private individuals who came upon the property by invitation of the tenants, they were

under no duty, save as they retained control over the elevator shaft or well."

Then follows citations of authorities, after which the court said:

"The cases are not harmonious on these propositions, but, in most of those holding to a contrary view, the premises were devoted to a public or semipublic purpose, of which the lessor had notice, and were not put to merely private uses, as was the building in this case. Most of the authorities may be harmonized when this distinction is kept in mind. If the premises are devoted to public or semipublic purposes, or if there be a duty owing to the public in general, the landlord cannot absolve himself from liability by leasing them to a tenant, for he is under an affirmative duty, which he cannot so delegate to another as that failure of that other to repair makes him, and him alone, responsible for the injury."

The latest case we have found upon the subject is that of *Bailey v. Kelly,* 86 Kan., 911, 122 Pac. 1027, 39 L. R. A. (N. S.) 378. A girl sixteen years of age was drowned in a cistern. She was a servant of the tenant. The defective condition of the cistern was known by both landlord and tenant, although unknown to the servant. It was held, that where a nuisance dangerous to life is created by the owner, on his premises, or through his negligence is suffered to remain there, he cannot, by leasing the property to another, avoid his own liability to a person who is rightfully upon the premises and who, without fault, is injured by reason of such nuisance; that this liability extends to a servant of the tenant, notwithstanding the tenant, by reason of his own fault, or neglect, or knowledge of the danger, could not have maintained an action against the owner for an injury suffered by himself. The opinion discloses a very careful research of the authorities *pro* and *con* upon the subject, and, particularly, the phase of the case by which the

landlord sought to escape liability because the deceased was a servant of the tenant, under the general rule announced in 24 Cyc., p. 1119, which is, that the right to recover against the landlord by a subtenant, guest or servant of the tenant, is the same as the tenant's right would be had the accident happened to him, but he can have no greater claim against the landlord than the tenant himself would have under like circumstances. After a review of the cases upon this subject, the Kansas court was of opinion that the action was *ex delicto,* and the conclusion reached was that the doctrine of *caveat emptor* was not applicable to the servant of the tenant.

Other cases which adhere to the principle announced in the foregoing concerning leased premises for public or semi-public purposes are: *Camp v. Wood,* 76 N. Y. 92, 32 Am. Rep. 282; *Beck v. Carter,* 68 N. Y. 283, 23 Am. Rep. 175; *Campbell v. Portland Sugar Co.,* 62 Me. 552, 16 Am. Rep. 503; *Wendell v. Baxter,* 78 Mass. (12 Gray) 494; *Fox v. Buffalo Park,* 21 App. Div. 321, 47 N. Y. Supp. 788.

By citing and quoting from the above authorities we do not wish to be understood as approving all the declarations announced therein; we have referred to them for the purpose of disclosing the recognition of certain well defined legal principles concerning this class of cases and when applied to modern conditions, to, in part, make our deductions therefrom and apply them to the facts of this case.

A four story hotel containing an office and lobby, a dining room, about one hundred sleeping rooms, passenger elevator and other modern facilities furnished and doing a general hotel business, situate upon one of the principal streets between the Union Depot and the main business district of a city like Denver, when leased for hotel purposes, is unquestionably a semi-public place. We cannot concede that this question is debatable.

It is unquestionably as much a public place as is a private pier. This was fully recognized in *Swords v. Edgar,* 59 N. Y., wherein, at page 31, (17 Am. Rep. 295), it is said:

"We think it is clear that the intestate was lawfully upon the south half of the pier. It may be that it was not a public place or highway in the fullest sense of those terms. It was, indeed, private property to a certain degree.  *  *  *  Though private property, it was held as such for public objects. There is an implied license to vessels upon navigable waters, to enter and occupy piers built into or lying adjacent to such waters, in the manner and for the purposes contemplated by their erection. The keeping of such a pier is likened to the keeping of an inn; and a general license is given to all persons to occupy it for lawful and accustomed purposes."

See also *Wendell v. Baxter,* 78 Mass., 494.

We are of opinion, that this hotel comes under the rules announced in the authorities as applicable to semipublic places and the rules applicable to patrons or guests of such semipublic places are likewise applicable to the paid guests of this hotel and the rule announced in Vol. 24 Cyc. 1119, and the cases cited by the appellant which limit the right of the subtenant, guest or servant of the tenant as against the landlord to no greater claim than the tenant would have under like circumstances, is not applicable to the paid guest of this hotel. It being a semipublic place is a potent reason for one of the exceptions to the general rule, and places the guest more in the category of a stranger, rather than in the shoes of the tenant who is operating the hotel under a lease. It does not appeal to reason to say that one who comes into a strange city during his travels, and enters a public hotel, without any knowledge of its ownership, its leases or conditions governing its control, and is there injured by reason of a dangerous condition existing therein at the time it was leased, should be deprived of recovery

because perhaps the day before the owner had leased the hotel to an insolvent person. What reason can there be for holding that such a stranger should occupy the same position as the lessee and be bound by the same limitations? He does not know the lessee, nor even know there is a lessee, much less does he know anything about the arrangements between the lessor and the lessee, and the duties devolved upon each under the terms of the lease. The owner of the building (as in this case) has maintained it as a hotel, rents it as a hotel, in this case fully furnished for such purpose. He knows that the place is to hold out an invitation to the public to enter therein. More than that, when he leases for that purpose he leases for a purpose which gives a general license to all persons to enter the same for lawful and accustomed purposes. His profit is indirectly derived from the custom derived from the traveling public. If it were a crime to hold out an invitation to the public to enter it as a hotel, or otherwise, directly or indirectly solicit or secure guests therefor as a hotel, the appellant would unquestionably be guilty of aiding and abetting the commission of the crime, if not in fact be a party thereto. It follows that if, when let, the elevator was in a defective condition which was dangerous to the guests when used for the purposes intended, and this fact was known, or, in the exercise of reasonable diligence, ought to have been known by the appellant, that it is liable to the paid guests of the hotel, when in the exercise of ordinary care, for injuries resulting to them upon account of such defective condition.

Under the circumstances as disclosed by the terms of this lease, if material, it might be proper to assume that the appellant was of this view itself until this accident happened. Its lease provides that the lessee shall keep the elevator in good condition and also pay one-half the cost of accident insurance covering accidents

in connection with the elevator. The lessor agreed to pay one-half the cost of keeping it in repair and reserved the right to enter and inspect the premises and if not satisfactory to terminate the lease. It kept a $5,000 accident policy in force for its protection, but regardless of these facts concerning its intentions and the steps it took for its protection which are probably immaterial as its liability to this appellee is limited to what the law imposes and such liability cannot be escaped by its contract with lessee to keep the property in repair.—*Swords v. Edgar,* 59 N. Y. 28, 17 Am. Rep. 295; *Nugent v. B. C. M. R. Co.,* 80 Me. 62, 12 Atl. 797, 6 Am. St. Rep. 151; *Burner v. Higman & Skinner,* 127 Iowa, 580, 103 N. W. 802; *Albert v. State,* 66 Md. 325, 7 Atl. 697, 59 Am. Rep. 159.

In order not to be misunderstood concerning the liability which attaches to this landlord, upon account of the defective condition of the property at the time of the accident, we call attention to the fact that we are only considering the defective conditions which were in existence at the time of the execution of the lease, and thereafter continued up to the time of the accident. By instruction No. 5 the jury were told, if, at any time between November the 1st, 1907 (which was the date of the lease) and the date of the accident, the elevator was put in a condition of proper repair for ever so short a time, that no verdict could properly be rendered against this appellant although they should further believe from the evidence that the elevator was out of repair at the time of the accident to plaintiff and that such accident was caused by such lack of repair. By this instruction it will be observed that no liability was placed upon the landlord for conditions which might come into existence after the giving of the lease, but limited its liability to injuries caused by defective conditions in existence at the time it turned the property over to the tenant.

We are not impressed with the appellant's contention that the elevator was in no respect dangerous, and that under no circumstances could it or any acts pertaining to it become in the nature of a private nuisance, for the reason though out of repair and dangerous when being operated that when let alone and kept closed it was harmless and could injure no one, and that it was possible to operate it in its then condition without causing an accident. At the time of the execution of this lease it was understood by the landlord that it was to be used as a passenger elevator. It was the only practical means for the transportation of the guests to their rooms on the three upper floors. Under such circumstances, the negligence of the appellant in omitting to place it in repair is in the nature of a nuisance.—21, Am. & Eng. Ency. of Law (2d Ed.) p. 701 volume 29, Cyc. 1188; Wood on Nuisances (3d Ed.) § 127. See, also, *Hill v. President & Trustees of Taulatin A. & P. U.*, 61 Or. 190, 121 Pac. 901, and cases therein cited.

As we understand the rule pertaining to liability when applied to articles of this kind, it is, whether it was dangerous and unsafe when used for the purposes and in the ordinary manner intended and not whether it was safe and harmless when let alone or possible to operate it without an accident.—Volume 29, Cyc. 1152; Wood on Nuisances, (3d Ed.) c. 1; *Owings v. Jones,* 9 Md. 108; *Rich v. Basterfield,* 56 E. C. L. 784; *Anderson v. Hayes,* 101 Wis. 538, 77 N. W. 891, 70 Am. St. Rep. 930; *Swords v. Edgar,* 59 N. Y. 28, 17 Am. Rep. 295; *Burner v. Higman & Skinner,* 127 Iowa, 580, 103 N. W. 802.

It is claimed that the proximate cause of the accident was the negligence of the lessee in failing to keep the elevator entrance closed or guarded during the absence of the pilot and not the defective condition of the elevator. We think it was both. This question has been

settled in this jurisdiction. In *Colorado Mortgage and Investment Company v. Rees*, 21 Colo., 435 it was held that where an injury is the result of the combined negligence of the defendant, and the negligent or wrongful act of a third person, for which neither plaintiff nor defendant is responsible, the defendant is liable when the injury would not have occurred except for his negligence. This principle is applicable here. The negligence of the landlord was the cause of the defective condition of the elevator, it being out of repair in having no lighting system, although such was necessary upon account of its location, and also the defective condition of its machinery which caused it to creep when left alone. The negligence of the lessee, Mr. Copeland, through his servant was in leaving the door open; neither the appellant nor the appellee was responsible for this act. The injury was the result of the combined negligence of both the lessor and the lessee. This is apparent for the reason that had the lessee, through his agent, closed and fastened the door upon leaving the elevator, the accident would not have occurred. Upon the other hand, had the elevator been in proper repair so that it would have remained at the entrance where the pilot left it and had not crept upward as it did, upon account of its defective condition, the accident could not have happened and had the cage's lighting system been in repair and a light been turned on, it is quite probable that the accident would not have occurred. We are thus confronted with the fact that the accident had to be the result of these combined acts of negligence of both the landlord and tenant, for without either the accident would not have happened. The case last cited was for damages upon account of injuries occasioned by stepping into an elevator shaft when the door was open and the cage not there. The lock to the door was out of repair so that it could be opened from the outside. The defendant sought to show that the door

had not been left open by the elevator pilot, but had been opened by a boy by the name of Thorne, who had no connection with the property. It was held that such an act on his part would not constitute an efficient intervening cause that would relieve the defendant from liability, that if the boy had opened the door, his act, coupled with defendant's negligence, constituted the combined and concurrent causes of the injury. Upon this theory the court approved an instruction to the jury which reads as follows:

"The jury are instructed that if they find from the evidence that the defendant negligently failed to provide and maintain proper and secure fastenings to its elevator door, and by reason thereof the door was open at the time of the alleged accident, and that while so open and while elevator was in the upper part of the building, the plaintiff, while in the exercise of ordinary care, fell into the elevator shaft and was injured; and if such accident was reasonably to have been apprehended from the condition of the elevator door and its fastenings and of insufficient and inadequate light, then the plaintiff will be entitled to recover a verdict at your hands for such damages as he may have sustained. And under such circumstances it is wholly immaterial whether such door was opened by some third person or not, provided that such accident could not have happened but for the negligence of the defendant in keeping and maintaining the fastening to its elevator door."

To support this position the court quotes from Shearman & Redfield on Negligence, section 10 as follows:

"Negligence may, however, be the proximate cause of an injury of which it is not the sole or immediate cause. If the defendant's negligence concurred with some other event (other than the plaintiff's fault) to produce the plaintiff's injury, so that it clearly appears that but for

such negligence the injury would not have happened, and both circumstances are closely connected with the injury in the order of events, the defendant is responsible, even though his negligent act was not the nearest cause in the order of time.''

The appellant makes no complaint concerning instructions but seeks to distinguish this case from the former one, by reason of the fact that here a lessee was in possession. It is claimed that it was his duty to keep the door shut when the pilot was absent from the cage, and that the landlord had the right to assume he would perform the ordinary duties required of him in this respect. This line of argument pertaining to the duty of others was considered in the former case in which the suggestion presented itself, that the landlord had a right to assume that trespassers, boys or bystanders in the performance of their proper duties would let the elevator door alone, and not open it when the cage was not at that floor. The court held that this was not a defense but that it was incumbent upon the landlord to have the door in such a condition so that such an accident could not happen in this manner. In commenting upon this question, at page 444, the court said:

''It was the duty of defendant, in operating the elevator in question to exercise the utmost care and diligence, and to provide and maintain proper and secure fastenings to the doors opening into the elevator way that could not be opened or controlled from the outside. Therefore the court was correct in saying that it was 'wholly immaterial whether such door was opened by some third person or not, provided that such accident could not have happened but for the negligence of the defendant in keeping and maintaining the fastenings to its elevator door;' for, had it performed its duty in the premises, such interference by a third party would have been impossible; hence its negligence necessarily con-

curred in, and constituted an essential factor in, causing the injury."

We think the latter part of this declaration specially applicable here. Had this landlord performed its duty in placing the elevator in repair, the negligent act of the pilot in leaving the door open, if as a matter of law it was negligence, could not have occasioned the injury, hence, the landlord's negligence necessarily concurred in and constituted an essential factor in causing the injury.

The rule announced in *The Union Gold Mining Co. v. Crawford*, 29 Colo. 511, 67 Pac. 600, concerning the actions of a tenant in this respect is in point. The company had leased the different levels of its mines. The lessees delivered their ore to the company at the shaft, who hoisted it to the surface. A person working for the company at the bottom of the shaft was injured by an ore car escaping from an employe of a lessee in one of the levels and falling down the shaft. The tracks on which the ore cars ran were laid with too much grade and no barrier was placed at the shaft to stop the cars and prevent them from running into the shaft. It was shown they were in the same condition when turned over to the lessee as when the injury occurred. It was held that the company was responsible for the condition of the level and was liable for injuries caused by its negligence in maintaining the track with an excessive grade, and in not providing a sufficient barrier to stop the cars at the shaft. The same contention was made there as here, that, assuming the company to have been negligent in causing these conditions, it was not the proximate cause of the injury; that the act which caused the injury was that of the independent contractor or lessee; but the court held otherwise, and at page 522 said:

"The most ordinary foresight and prudence, it would seem to us, would have dictated some suitable pro-

tection at the mouth of the level. The most cautious man might lose control of a loaded car in a level such as the fourth level of this mine, and there was a breach of the positive duty of the company in not guarding against such an occurrence.''

The car had escaped from the employe of the lessee and while it is true the jury found that he was unable to prevent its escape by the exercise of ordinary care, the court, in holding that the escape of the car was not the proximate cause of the injury, cites with approval *The Colorado Mortgage and Investment Company v. Rees,* 21 Colo. 435, 42 Pac. 42, and also *Milwaukee Ry. Co. v. Kellogg,* 94 U. S. 469, 24 L. Ed. 256, which we think support our conclusion concerning the proximate cause of the injury.

This question was again under consideration in *Tanner v. Harper,* 32 Colo. 156, 75 Pac. 404, where it was alleged that the injury was caused by defendant's negligence in the manner of operating their mine and the defective condition of its appliances. It was shown that the injury was occasioned by the negligent act of a co-employe, coupled with a defective condition of certain appliances, concerning which question at page 163 the court says:

''The jury having necessarily determined that the defendants were negligent, and that plaintiff was not guilty of contributory negligence, the question of the negligence of the trammer is practically eliminated. In the order of events the injury was caused by the grossly culpable negligence of the trammer, but if the defendants had taken the proper precautions to keep the truck from falling into the shaft in the circumstances it did, the injury would not have happened; so that the sole cause of the plaintiff's injury was not the negligence of the trammer in handling the car, but the result of the concurrent negligence of the defendants in failing to exercise a

reasonable degree of care to prevent the car from being precipitated into the shaft when left standing upon the track. When the injury of an employee by a coemployee would not have happened except for the negligence of the common employer, the latter is responsible for the injury.—*Cone v. Del., L. & W. R. R. Co.,* 81 N. Y. 206 (37 Am. Rep. 491) ; *Sherman v. Menominee R. & L. Co.,* 72 Wis. 122 (39 N. W. 365, 1 L. R. A. 173) ; *D. & R. G. Ry. Co. v. Sipes,* 26 Colo. 17 (55 Pac. 1093) ; *Grand Trunk Ry. v. Cummings,* 106 U. S. 700 (1 Sup. Ct. 493, 27 L. Ed. 266) ; Shearman & Redfield on Negligence, § 10; quoted with approval in *C. M. & I. Co. v. Rees,* 21 Colo. 435 (42 Pac. 42).''

Our Court of Appeals has had occasion to consider this question. In *City of Denver v. Johnson,* 8 Colo. App. 384, 46 Pac. 621, it was held, as stated in the syllabus :

"Where several concurring acts or conditions of things—one of them, the wrongful act or omission of the defendant—produce the injury, and it would not have been produced but for such wrongful act or omission, such act or omission is the proximate cause of the injury, if the injury be one which might reasonably be anticipated as a natural consequence of the act or omission.''

It is claimed, that assuming the elevator was out of repair and that the accident would not have happened except for such conditions, that was not such an accident as reasonably might have been foreseen or anticipated; that though the cage did creep when left alone after being properly stopped and that no arrangements were made for lighting it; that the landlord was not bound to anticipate that the tenant would not keep a pilot in it when being used, but that it had the right to assume that he would, for which reason it cannot be held. In commenting upon this question in the Rees case, *supra,* at page 445, the court quotes with approval the following:

"The act of a third person, intervening and contributing a condition necessary to the injurious effect of the original negligence will not excuse the first wrongdoer, if such act ought to have been ·foreseen. The original negligence still remains a culpable and direct cause of the injury. The test is to be found in the probable injurious consequences which were to be anticipated, not in the number of subsequent events and agencies which might arise."

In *Lane v. Atlantic Works,* 111 Mass. 136, from which the foregoing quotation is taken, it is also said:

"The injury must be the direct result of the misconduct charged; but it will not be considered too remote if, according to the usual experience of mankind the result ought to have been apprehended.

"The act of a third person, intervening and contributing a condition necessary to the injurious effect of the original negligence, will not excuse the first wrongdoer, if such act ought to have been foreseen."

In Vol. 13, Cyc., at page 25, in note 54, with many authorities cited to support it, it is said:

"Where the effect could reasonably have been foreseen and where in the usual course of events it was likely to follow from the cause, the person putting such cause in motion will be responsible, even though there may have been many concurring events or agencies between such cause and its consequences."

In Vol. 21, Am. & Eng. Ency. of Law, (2d Ed.), at page 491, it is said:

"An act or omission may yet be negligent and of a nature to charge a defendant with liability, although no injuries would have been sustained but for some intervening cause, if the occurrence of the latter might have been anticipated."

By these declarations we do not understand it is meant that the particular accident should have been

anticipated or foreseen, or, that it should be anticipated that an accident should occur in this particular manner, but when applied to the facts of this case the rule is that if it was to be expected, or could reasonably have been foreseen by a person of ordinary foresight and prudence, that in the operation of a passenger elevator in the condition which the plaintiff's witnesses say this one was, that it would be the cause of an accident, that the liability is then established so far as this phrase of the matter is concerned.  As said by this court in *Clifford v. The Denver, South Park & Pacific Railroad,* 9 Colo. at page 338 (12 Pac. 221):

"The principle above stated does not declare that the damage or injury *must* have resulted, or even that it must have been anticipated, in the particular case under consideration.  On the contrary, it has been well said 'that the consequences, of negligence are almost invariably surprises.'  The expression 'reasonable expectation,' frequently used in this connection, is said to mean 'an expectation that some such disaster as that under investigation .will occur *on the long run* from a series of such negligence as those with which the defendant is charged.'  Whart. Neg. §§ 77, 78, and cases cited."

This language is applicable here.  This particular accident was unquestionably a surprise.  Most accidents usually are.  We do not think the appellant had the right to turn this elevator over in such a defective condition as disclosed by the plaintiff's witnesses, under the assumption that in its then condition it would be managed in such a manner as to prevent all accidents.  'Tis true, it could have been kept closed and not used at all.  This would have avoided the probability of any accident, but it was understood it would be used as a passenger elevator for the hotel.  Under such circumstances it is beyond the limits of common understanding to believe that the door where the cage is then stationed will at all

times be closed when the elevator pilot is not standing within the cage, but the contrary ought to have been foreseen, and anticipated, by any person of ordinary foresight and prudence. Such a condition is certainly not beyond reasonable expectations. It was unquestionably not a circumstance of an extraordinary nature, but was one which reasonably ought to have been foreseen and anticipated.

It is claimed that the evidence did not exclude the possibility of the car being out of place from causes other than the one alleged; also, that the evidence discloses that there were causes which might have caused the elevator to creep other than its being out of repair. The appellant was given full opportunity to present this line of testimony to the jury. They made their findings under instructions concerning which no complaint has been made. There is evidence to support them; under such circumstances it is not the province of this court to disturb the verdict of the jury.

Perceiving no prejudicial error the judgment is affirmed.                                          *Affirmed.*

CHIEF JUSTICE MUSSER and Mr. JUSTICE GABBERT concur.

---

## On Petition for Rehearing.

Counsel earnestly contend, that there is absolutely no evidence to sustain the contention that the elevator was out of repair and in an unsafe condition at the time of the execution of the lease; that the jury, the trial judge and this court are all wrong in assuming that there is an iota of testimony to thus show. For this reason we have re-read the evidence in order to ascertain if there is an entire lack of competent testimony upon this subject. The lease was for the term of one year, commencing

November the 1st, 1907. The accident occurred June 27, 1908. The trial was in November, 1909. The witness Frank A. Linton testified, in substance, that he had been a resident of Denver for about eight years; that he worked in this hotel about six years; that he worked there during the years 1907 and 1908 and had occasion to observe the action of this elevator; that during this period it would creep up and down just according to the way you would pull on the cable; that the air would get out; that it would move one way or the other without anybody being there; that it did this in 1907 and 1908; that he could not give the exact dates but that it never worked properly at all times, the whole time he was there; that sometimes it would stand right on the level of the floor, and then again it would creep up; that when he worked at the desk he had occasion to see it creeping, sometimes once or twice through the day; that the elevator was out of order while he worked there at different times off and on; that during all of the year 1907 it was in the condition above described; that they packed it once but the packing did not fit right, and it got out of order; that he did not know the exact date it was packed but it was after this accident, possibly three or four weeks; that the elevator was back about thirty feet from the front of the building and back of the office; that there was a wire mesh or netting on the outside of the elevator; that there was a wooden porch in front of the building on account of which, at about 4 o'clock in the afternoon and thereafter, it was so dark you could not read a paper in the elevator; that there was no provision for connection of the electric light in the elevator cage.

Olaf Nelson testified, in substance, that he had been an employe in this hotel since September, 1894; that he was still there at the time of the trial and was there during 1907 and 1908; that during this period he was familiar with this elevator; that he ran it sometimes; that

it had crept more or less since he came to the hotel; that he noticed it more in the last four or five years; that when he pulled it to a stop, and went away, it would creep quite often; that two or three times a day when the boy left the elevator he had seen it up even with the floor, sometimes six inches or a foot more, sometimes up to his head, and that he had seen it up to the second floor; that he did not know of any particular change during the period he was there; that he came nearly having an accident with it; that when he pulled it (the elevator) to a stop and went away it would creep, but if he stood there and balanced it and saw that it stood still, it would not creep very much; that he could not swear that it would not creep but that he could swear that it did creep; that there was no light in the elevator.

Dan Dougherty testified that he was an experienced elevator operator; that he was the elevator pilot when the accident occurred; that it was an old hydraulic elevator; that at the time of the accident it was so dark he could not read the address on a letter or package on the inside of the cage; that the elevator could not be depended upon; that it was in such a condition that he never knew at any time when he left it whether it was going to stand without creeping or not; that when he set it the way it would be supposed to stand to stop, it would hold it in place as he went away; that lots of times he would go back and the elevator would be half way up to the other floor; that he would set it and it would probably stand for a few minutes; that sometimes it would stop after it had crept a few feet; that it was never the same; that you could not tell by the place in which you put the cable in advance whether it was going to move or not; that when he adjusted the cable to the very best of his experience it would creep; that just before the accident before leaving the elevator he fixed it so that it was standing for the time being; that when

he then left he did not touch the ropes; that when he returned, which was in a minute or a minute and a half, the bottom of the elevator was near the second floor.

Jesse C. Brockway, a witness upon behalf of the defendant, testified that he was the engineer in charge of the engines in this building, and likewise had supervision over the elevator; that he was there on the 1st of November, 1907, and continued up to and after the 27th day of June, 1908. In cross-examination he testified that the last time it was packed was in January, 1908; that he thought that it had not been packed before that for something in the neighborhood of three years and then it was packed by Nock and Garside, the manufacturers of the elevator; that he, the witness, had not packed it since the time Nock and Garside packed it in the first place.

G. S. Tears, an engineer with eleven years experience in the handling of elevators, testified, that if the cups on the valve leaked or were worn out the water would pass and cause the car to creep; that the piston in a cylinder proper is packed with square hydraulic or flat packing, if that is leaking the car will creep, but that if both the conditions above referred to are perfect in the piston and the valve that a cage will not creep; that the more the valve is out of repair or the piston out of repair it will accelerate the quickness with which a car will creep; that when the machinery is out of repair if the pilot will drop down below and work up a little that sometimes he will get it stationed so that puts it in the reverse as you might say, that it will then balance on the leaking, but that this cannot be depended upon; but that if the piston and the valve are in perfect condition and not leaking if a car is brought to a standstill so that it is perfectly motionless, it will not start of its own volition.

Martin H. Collin, another experienced engineer, gave similar testimony.

It is not the province of this court to supersede the functions of the jury. From the foregoing synopsis of the testimony of these witneses it is self-evident that there is competent testimony upon which the jury might be justified in finding as they did, that this elevator was out of repair at the time of the execution of the lease upon November the 1st, 1907, and at that time was unsafe for use for the purposes intended. Whether these witnesses are to be believed was for the jury to determine.

The petition for rehearing is denied.

Decided June 2, A. D. 1913. Rehearing denied December 1, A. D. 1913.