No. 13,332.

RAINS *v.* RAINS.
(46 P. [2d] 740)

Decided June 10, 1935.

20

Messrs. Lindsey & Larwill, Mr. D. K. Wolfe, Jr., Mr. E. C. Burck, for plaintiff in error.

Mr. S. Harrison White, Mr. William O. Perry, for defendant in error.

*In Department.*

Mr. Chief Justice Butler delivered the opinion of the court.

Leona Neveu Rains, referred to herein as the plaintiff, recovered judgment against her husband, Glen A. Rains, referred to herein as the defendant, for damages for injuries sustained in an automobile accident caused by his negligence. He seeks a reversal of the judgment.

1. The first assignment raises the question whether a wife may sue her husband for a tortious wrong against her person.

We have adopted the common law of England so far as it is applicable and is of a general nature and has not been altered by legislation. C. L. §6516. At common law the legal existence of the wife was merged in that of her husband; they were regarded as one person in law, and the husband was that person. He had control, almost absolute, over the person of his wife. She was in a condition of complete dependence, and was bound to obey her husband. 13 R. C. L., p. 983. Bacon, in his Abridgement, Title Baron and Femme, B, says: "The husband

hath, by law, power and dominion over his wife, and may keep her by force within the bounds of duty, and may beat her, but not in a violent or cruel manner.'' Speaking of the common-law reason for imposing legal disability upon married women, Walker, in his American Law (11th Ed.) section 102, says: ''In other words, lest the wife might be sometimes tempted to assert rights in opposition to her husband, the law humanely divested her of rights.'' As a result of the unity of husband and wife, she could not in her own name sue a third person to enforce her rights, it being the law that such action had to be prosecuted by husband and wife jointly, and, of course, it would be absurd for a husband to join his wife in an action against himself. Nor could the husband sue the wife. By doing so he would be suing himself, for, as we have seen, husband and wife, in contemplation of law, were one, and he was that one. 13 R. C. L., pp. 983, 1394. Statutes that were designed to remove from married women the disabilities imposed upon them by the common law have been enacted in most, perhaps all, of the states. They vary greatly in their scope, some being narrow and illiberal, others broad and liberal. The same may be said of the construction given by the courts to the various statutes. The earlier decisions, especially, were narrow and illiberal, a fact to which, in *Wells v. Caywood,* 3 Colo. 487, we called attention in the following language: ''The courts, * * * in the States which were the first to pass enactments for the enlargement of the rights of married women, regarding such enactments as a violent innovation upon the common law, construed them in a spirit so narrow and illiberal as to almost entirely defeat the intention of the law-makers * * *.''

Blackstone, in his Commentaries (Book 1, p. 442) remarked: ''Upon this principle, of an union of person in husband and wife, depend almost all the legal rights, duties, and disabilities, that either of them acquire by the marriage.''

Whatever may be the law elsewhere, if the com-

mon-law fiction of unity ever existed in this state, it does not exist here now. *Hedlund v. Hedlund,* 87 Colo. 607, 290 Pac. 285, and the statute and cases there cited. In the Hedlund case we said: ''First, it is assumed that the common-law fiction that husband and wife are one still persists in this state. In *Whyman v. Johnston,* 62 Colo. 461, 163 Pac. 76, we said that the fiction of one legal personality no longer exists. One has but to read the statutes of the state and the decisions of this court and of the Court of Appeals to realize that in the present state of the law the so-called unity of husband and wife is a mere figure of speech no longer having any practical significance.''

In *Schuler v. Henry,* 42 Colo. 367, 94 Pac. 360, we said: ''By our statute there is a complete change in all this; and the Colorado wife is not the wife as at common law, but is vested with absolute control and dominion over her property and her person. She may sue and be sued as though she were sole; she may engage in business on her own account; she may sell and convey her property without the consent of her husband; her property is not liable for her husband's debts; she is entitled to the earnings of her labor; she may execute any bond, bill or promissory note, and may contract debts in her own name; and in every suit or proceeding, when judgment is rendered against her, it may be enforced by execution against her. She may dispose of her property by will, and the law places both husband and wife upon the same level with reference to the disposition of property by will; the provisions of the statute are slightly different, but the effect is the same, and neither can dispose of more than one-half of the property without the consent of the other. Either husband or wife may incur indebtedness for the family expenses, and for such indebtedness either or both will be liable. The husband is not liable for the debts of his wife contracted before marriage, except to the extent that he may have received property from her. The right of the husband to beat his wife or to imprison her to

enforce obedience to his will is no longer recognized as a right by our race, and such treatment of the wife is practiced only by those of brutish instincts. The husband is no longer entitled to the exclusive possession of the children. Although there exist certain reciprocal obligations and duties growing out of the marital relation, whatever they are, they are not based upon the supposed vassalage of the wife or the imagined lordliness of the husband. Thus it will be seen that the wife in Colorado has been wholly emancipated 'from the condition of thraldom in which she was placed at common law.' "

As the nonliability of the husband to the wife for damages for a personal tort was founded upon the common-law fiction that husband and wife were one (13 R. C. L., pp. 1394, 1396), it would seem to follow that where that fiction is abolished, the nonliability does not survive. When the foundation is removed, the superstructure falls. "Reason is the soul of the law, and when the reason of any particular law ceases, so does the law itself." Broom's Legal Maxims (7th Ed.), 159. In *Wells v. Caywood, supra,* we said: "The wife in Colorado is the wife under our statutes, and not the wife at common law, and by our statutes must her rights be determined."

We are not unaware of the fact that in the greater number of jurisdictions the courts have held that the wife cannot sue the husband for an injury to her person. 13 R. C. L., p. 1394, et seq. In some of the cases the courts construed statutes wholly unlike ours; in others the statutes somewhat resemble ours; and in still others the statutes are practically the same as ours. It would be a fruitless task to discuss the various terms of the many statutes. To attempt to reconcile the decisions would be to attempt the impossible. In 13 R. C. L., pp. 1396, 1397, it is said: "Opposed to the general view taken by the courts as to the effect of the married women's statutes on her right to sue her husband for a tort committed by him on her person, the statutes have been construed in several very recent cases to so abrogate the common law

fiction of the identity of husband and wife as to permit a wife to maintain an action against her husband for a tort to her person. And it has been said that apart from the consideration of the particular forms of statutes involved, the opinions in these recent cases together with the dissents in earlier cases construing statutes concerning married women's rights, seem to indicate a growing inclination to construe such statutes liberally, and, if possible, to give this right of action thereunder, and not to consider it as opposed to 'public policy' so to do.''

Section 6, article II, Colorado Constitution, is as follows: ''That courts of justice shall be open to every person, and a speedy remedy afforded for every injury to person, property or character; * * *.'' In this state a wife, as we have seen, is a person independent of the husband, and this section guarantees her a remedy for every personal injury without making any exception as to the person inflicting the injury, who may be her husband or a third person.

Section 5577, Compiled Laws, provides: ''Any woman may, while married, sue and be sued, in all matters having relation to her property, person or reputation, in the same manner as if she were sole.'' Here, also, there is no exception as to the person she may sue.

Section 6 of the Code of Civil Procedure is as follows: ''A married woman may sue, and be sued in all matters, the same as if she were sole.'' There is no exception as to the person she may sue.

It is urged with some force that this section relates to procedure only, and does not confer a substantive right. But that objection cannot be urged successfully against section 6, article II, of the state Constitution or section 5577, Compiled Laws, quoted above.

If A, before his marriage to B, intentionally or negligently injures her person, she, a femme sole, could sue him for damages. If he so injures her after their marriage, she has the same right to sue him, because, under the Constitution and the statutes of this state, as we con-

strue them, she may sue in all matters the same as if she were sole.

In *Wells v. Caywood, supra,* we noted the fact that the asperities of the common law "are gradually softening and yielding to the demands of this enlightened and progressive age." And in *Williams v. Williams,* 20 Colo. 51, 56, 37 Pac. 614, we said: "By sundry legislative acts, dating from an early period, the disabilities of coverture have been gradually removed in Colorado, and these acts have been so liberally construed by the courts that controversies respecting the status of married women have practically disappeared from our jurisprudence."

In view of the broad, liberal provisions of the Constitution and statutes of this state and the liberal construction thereof adopted by the courts of this state, we are unwilling to follow the decisions of courts that hold that a wife has no right to sue her husband for a personal injury caused by him. The following cases, holding that a wife may sue her husband for such an injury, seem to us to define more justly the legal rights of married women in this day and age: *Brown v. Brown,* 88 Conn. 42, 89 Atl. 889; *Bushnell v. Bushnell,* 103 Conn. 583, 131 Atl. 432; *Fiedler v. Fiedler,* 42 Okla. 124, 140 Pac. 1022; *Roberts v. Roberts,* 185 N. C. 566, 118 S. E. 9; *Fitzpatrick v. Owens,* 124 Ark. 167, 186 S. W. 832; *Gilman v. Gilman,* 78 N. H. 4, 95 Atl. 657; *Prosser v. Prosser,* 114 S. C. 45, 102 S. E. 787; *Wait v. Pierce,* 191 Wis. 202, 209 N. W. 475; *Harris v. Harris,* 211 Ala. 222, 100 So. 333; *Johnson v. Johnson,* 201 Ala. 41, 77 So. 335.

We hold that in this state a wife may sue her husband for personal injuries caused by the negligence of her husband.

██ █ 2. It is said that the jury were advised that an insurance carrier was involved in the defense of the action, and that the court's refusal to grant the defendant's motion to declare a mistrial on that ground was error.

The following is from the examination of juror Barnes

on voir dire: "Q. Mr. Barnes, you are familiar, are you not, and have knowledge of companies that insure against accidents and injuries that result from accidents? A. Yes. Q. Are you acquainted with a corporation that engages in that kind of business known as the Globe Indemnity Company in this City? A. I have heard of them; I never had any dealings with them." Thereupon defendant's counsel requested the court to caution counsel not to follow that line any more. The court did not comply with the request, but no more questions along that line were put to the juror.

From the examination of juror Leo: "Q. Are you acquainted with the fact that there are a number of different companies that issue policies and indemnify against accidents? A. Yes." Defendant's counsel objected, and plaintiff's counsel promised to confine his question to a specific company. There was no ruling on the objection.

From the examination of juror Hall: "Q. You are acquainted, are you, with the Globe Indemnity Company, doing business in this city, a New York concern, with offices on California Street, in the 1700 Block? A. I have heard of them, but I am not acquainted with them. Q. You know what their business is, do you? A. I have not given it any particular attention. I know they are in the insurance business. Q. Do you know they are engaged in insuring against accidents? A. As I said before, I never gave it any thought other than they were in the insurance business." Defendant's counsel made the following objection: "If your Honor please, we object to the question with respect to the line of business employed by the Globe Indemnity Company. There are certain limitations fixed upon counsel of that character that ought to be observed. We do not want to take the time of the Court in demanding a mistrial in the discharge of this jury and the selection of a new one. He has a specific right to ask as to the particular company and the officers, but he has no right to inquire as to the nature of

their business. We object strenuously.'' The court sustained the objection.

Juror Hickerson then was examined. We quote from the record: "Q. Would the fact that you are an automobile dealer influence you either one way or another in this case? A. Well, not as an auto dealer, but I happen to know Glen Rains; I don't know Mrs. Rains. I have done business with Cashman & Evans and the Globe Indemnity Company. Q. And carry policies in that company now, do you? A. Yes, sir. Q. Well, would those facts have any influence upon you? A. I think it would, yes, sir. Q. You think it would? A. Yes. Q. Don't you think you could sit here as an impartial juror and determine this case according to the law and the evidence without regard to your dealings with these other men and your acquaintance? A. I don't think so. I would hate to jeopardize my standing with Cashman & Evans, in view of the fact that they spend money with me. Q. You would assume and believe that that concern would be prejudiced against you if you brought in a verdict against them? A. That I don't know. Q. But you would be afraid of it, would you? A. I wouldn't want to take a chance.'' Thereupon defendant's counsel moved that the jury be discharged, which motion the court denied. The juror was excused by consent of counsel.

That the defendant carried indemnity insurance and that the attorneys representing him in the litigation were employed by the insurance carrier, the Globe Indemnity Company, was admitted by one of his attorneys in oral argument in this court. The question is how far an attorney for the plaintiff may go in protecting his client against the danger of having biased, prejudiced jurors sit in the trial of the case. Courts have experienced difficulty in drawing the line between that which is permissible and that which is not. The difficulty arises when an action, though, according to the record, defended by the defendant, in reality is defended by an indemnity company, upon whom the financial loss ultimately would

fall in case of a judgment against the defendant of record. The plaintiff's attorney must be allowed considerable latitude in examining jurors on voire dire. In order to enable him properly to exercise not only challenges for cause but also peremptory challenges, he is permitted to ask a juror whether he is related to or has any business dealings with the defendant, or is a member of any organization of which the defendant is a member, or concerning any other matter that would tend to disclose the juror's disqualification or make it undesirable to retain him as a juror; the trial court, however, having a reasonable discretion in determining the scope of such examination. When back of the defendant stands an indemnity company, actively conducting the defense and having a direct financial interest in the result—in a sense, a loose sense perhaps, a real party in interest—justice demands an equally wide latitude in the examination of jurors on voir dire. When back of a criminal prosecution for cattle stealing is a cattle dealer's association, whose attorney appears as special prosecutor, no one could contend successfully that the defendant's attorney, in examining jurors on voir dire, could not inquire whether the jurors are officers, members or employees of such an organization, as well as whether the jurors are officers, members or employees of the corporation that owns the cattle alleged to have been stolen. Other examples may be selected from other branches of the law, civil and criminal.

But when a personal injury case comes on for trial the trial court is asked to conceal behind an impenetrable veil of secrecy the indemnity company's interest in the outcome of the litigation, which is more direct than is the interest of a cattle dealer's association in the outcome of a criminal prosecution for cattle theft. It is not always easy to do that. In these days of automobiles indemnity insurance has assumed vast proportions. By extensive advertising and personal solicitation, indemnity companies have scattered broadcast the nature of their busi-

ness and have made it a matter of common knowledge. Few, if any, jury panels do not include owners of automobiles, and it is folly to attempt to blind ourselves to the fact that most, if not all, jurors know of the existence of indemnity insurance companies and their frequent connection with automobile accident cases. In such circumstances, it is difficult for the courts to strike a balance between the rights of the plaintiff on the one hand, and those of the defendant and his indemnitor on the other, and fully protect the rights of all. A question put to a prospective juror as to whether he has any interest in or connection with a certain indemnity company would convey to the mind of every intelligent juror the knowledge that an indemnity company was interested financially in the outcome of the litigation; and yet no one could successfully challenge counsel's right to ask that question. *Vindicator Consol. G. M. Co. v. Firstbrook,* 36 Colo. 498, 86 Pac. 313; *Cripple Creek Mining Co. v. Brabant,* 37 Colo. 423, 87 Pac. 794; *Independence Coffee & Spice Co. v. Kalkman,* 61 Colo. 98, 156 Pac. 135; *Tatarsky v. Smith,* 78 Colo. 491, 242 Pac. 971; *Bolles v. Kinton,* 83 Colo. 147, 263 Pac. 26.

In the Vindicator case we passed upon another question also. A witness testified that he obtained a release from the plaintiff. There was a conflict in the testimony with respect to the circumstances under which the release was obtained. It was held permissible for plaintiff's counsel to bring to the attention of the jury the interest which the witness, by virtue of his relation to the insurance company, had in securing the release as well as in the result of the action.

*Coe v. VanWhy,* 33 Colo. 315, 80 Pac. 894, is cited by the defendant's counsel. It is wholly unlike the present case. There, counsel for the plaintiff, without any evidence upon which to base his statement, told the jury *in argument* that it was the custom of employers to protect themselves by taking out liability insurance.

In *Phelps v. Loustalet,* 91 Colo. 350, 14 P. (2d) 1011,

also cited by counsel, we held that the admission of evidence that the defendant told the plaintiff that he (the defendant) carried insurance was prejudicial and reversible error. It was not an admission of liability; it did not show bias or prejudice on the part of any witness; it was wholly immaterial. In that case it does not appear that the fact that the defendant was insured was brought inferentially to the attention of the jury in the course of the examination of jurors or in any manner other than as stated above. The language of the court in the opinion should be read in the light of the facts disclosed by the record.

In the case at bar it was permissible for plaintiff's counsel to ask the prospective jurors concerning their interest in or connection with the Globe Indemnity Company. It may be that it was not permissible to ask them whether they knew of companies that "indemnify against accidents," or to state that the Globe Indemnity Company "engages in that kind of business"; but however that may be, the permissible question conveyed, by necessary inference, to every intelligent juror the information conveyed by the questions objected to. That was unavoidable. In *New Aetna Portland Cement Co. v. Hatt,* 145 C. C. A. 497, 231 Fed. 611, it is said: "In other words, any question tending to reveal possible interest or bias of a person offered as a juror is admissible because of its relevancy to the matter of his fitness for such service; the circumstance that the question has the additional effect of suggesting the existence of a fact irrelevant to the merits of the case (indemnity in this instance) is not an uncommon occurrence." After the examination of jurors Barnes, Leo and Hall the defendant's counsel, in objecting to the question put to Hall, expressly stated that he did not wish to demand a discharge of the jury, but insisted upon his objection to the question put to Hall, and, as we have seen, the court sustained the objection. Counsel's statement constituted a waiver of the right to have

the court declare a mistrial at that stage of the proceeding.

The questions asked juror Hickerson, practically informing him — incorrectly, of course — that a verdict might be rendered against the indemnity company's agents, Cashman and Evans, went beyond the permissible and should not have been asked. If an objection to the question had been made, it doubtless would have been sustained. Instead, a motion to discharge the jury was interposed and denied; whereupon, by agreement of counsel, Hickerson was excused from the jury.

Considering all the circumstances, we do not think that the refusal of the court to declare a mistrial and discharge the jury prejudiced the substantial rights of the defendant. Here, as in *Tanner v. Harper,* 32 Colo. 156, 75 Pac. 404, the great weight of the evidence sustained the verdict for the plaintiff, and there were no close questions of fact in the determination of which the jury might have been unconsciously influenced by the questions put to them. Besides, through legitimate questions put to the jurors, every intelligent juror must have known that the Globe Indemnity Company was financially interested adversely to the plaintiff in the outcome of the case. It would tax our credulity to suppose that the jurors were not aware of the real situation before the objectionable questions were put to juror Hickerson. The examination of that juror made it appear so clearly that his relations with the company and its agents, Cashman and Evans, were such as to make it improper for him to sit in the trial of the case that both sides joined in requesting the court to excuse him.

We conclude that the defendant is not entitled to a reversal of the judgment because of the voir dire examination of the jurors.

3. Mrs. Betty Evans, shown by the evidence to be the wife of T. J. Evans, an agent of the indemnity company, testified in behalf of the defendant. In his opening argument to the jury, counsel for the plaintiff, in com-

menting on her testimony, said: "Mrs. Evans, the evidence shows, is the wife of Mr. Evans, who is the general manager in this city of the Globe Indemnity Company." Thereupon counsel for the defendant moved the court to declare a mistrial, on the ground that the remark was a manifest attempt to inject the insurance company into the case. The court denied the motion, and its ruling is assigned as error. Mrs. Evans had testified, *without objection*, that she is the wife of John Evans, and that her husband is an agent of the Globe Indemnity Company. Considering all the circumstances attending the trial and to which we have called attention, we cannot say that the court's refusal to declare a mistrial necessitates a reversal of the judgment.

4. Objection is made to the refusal of the court to give two instructions requested by the defendant. So far as they state the law correctly, they are covered by instructions given by the court.

5. Two objections are made in the briefs to instruction No. 5 given by the court. The objections now urged are not the objections that were made to that instruction in the trial court, and therefore will not be considered. Supreme Court rule 7.

We find no reversible error in the record. The judgment is affirmed.

Mr. Justice Burke and Mr. Justice Young concur.