No. 20,293.

GERALD P. TESONE, A MINOR, ET AL., *v.*
SCHOOL DISTRICT No. RE-2, BOULDER COUNTY.
(384 P. [2d] 82)

Decided July 29, 1963.

Messrs. WILLIAMS & ZOOK, Mr. ROGER E. STEVENS, Mr. JOHN G. TAUSSIG, JR., for plaintiff in error.

Messrs. HUTCHINSON & HUTCHINSON, for defendant in error.

*En Banc.*

MR. JUSTICE DAY delivered the opinion of the Court.

THIS action by a minor, Gerald P. Tesone, through his father and next friend and by the father individually, against School District No. Re-2 in the County of Boulder, seeks to recover damages in tort for injuries alleged to have been sustained by Gerald while practicing bas-

ketball in the Louisville High School in Louisville, Colorado.

The trial court dismissed the complaint, ruling that defendant School District as a subdivision of the State of Colorado is immune from liability under what the court found to be the settled pronouncements of this court. Plaintiff in error admits that the holding in *City and County of Denver v. Madison,* 142 Colo. 1, 351 P. (2d) 826, and the later case of *Liber v. Flor,* 143 Colo. 205, 353 P. (2d) 590, precluded the trial court from ruling otherwise, that such holding constitutes up to the present day the law in Colorado. It is urged that these cases be overruled.

This we decline to do under the pronouncement in the Madison case, supra, wherein we said, "It is not within the province of the judicial branch of the government thus to change long established principles of law. This is the function of the legislature * * *"

The judgment is affirmed.

MR. JUSTICE MOORE specially concurs.

MR. CHIEF JUSTICE FRANTZ, MR. JUSTICE HALL and MR. JUSTICE PRINGLE dissent.

MR. JUSTICE MOORE specially concurring.

I concur in the opinion of Mr. Justice Day. In view of the fact that Mr. Chief Justice Frantz in his dissenting opinion has once more seen fit to advocate that we should overrule the considered opinions of this court in at least forty cases extending over a period in excess of eighty-five years, I must again direct attention to certain fundamental principles which I believe would be ignored or violated if a majority of this court were to follow the course suggested by said dissent.

It is asserted that we should now reject the doctrine, heretofore firmly established in the law of this jurisdiction, that municipal corporations are not liable for the negligent acts of their servants committed in the dis-

charge of duties which are governmental in nature. As already indicated, cases far too numerous to mention in detail have upheld this doctrine ever since the State of Colorado was admitted to the Union. Indeed the doctrine was approved by a majority of the court on three separate occasions in a single recent volume of the Colorado Reports, and in a single year, namely 1960, the rule was approved on four occasions, and in each case the arguments advanced in the instant dissenting opinion were presented and rejected by a majority of the court. Some of the cogent reasons why they should have been, and were, rejected are set forth in the majority opinions to which we refer. *Denver v. Madison,* 142 Colo. 1, 351 P. (2d) 826; *Liber v. Flor,* 143 Colo. 205, 353 P. (2d) 590; *Faber v. Colorado,* 143 Colo. 240, 353 P. (2d) 609; *Berger v. Dept. of Highways,* 143 Colo. 246, 353 P. (2d) 612.

In no opinion of this court has it ever been held that the rule of nonliability of a governmental agency for the negligent acts of its servants in the performance of governmental duties, has in any degree whatever been modified, discarded or minimized. Sentences lifted from the context of opinions dealing with actions *ex contractu* in situations which do not have the slightest resemblance to the issues involved in tort actions, cannot be given the effect for which my dissenting brethren contend. The statement contained in the dissent that, "There is thus revealed a condition of unquiet flux on the subject. Where once the doctrine had smooth sailing, it is now rocking along in troubled waters," is without support in any one of numerous Colorado decisions dealing with tort actions, and can only find justification by *obiter dicta* in opinions deciding actions based on contractual rights and liabilities. The *obiter dicta* to which reference is made does not have the slightest bearing upon any issue arising in an action for damages based upon negligence, and the pertinence thereof is necessarily limited to actions based upon contract.

We have held repeatedly that if liability is to arise

against a governmental agency for the negligent acts of its servants engaged in a governmental function, this liability, heretofore unknown to the law of this state, must be a creation of the legislative branch of the government. I repeat again that it is not the function of the judiciary to create confusion and instability in well settled law, nor is it within the province of judges to refuse to apply firmly established principles of law simply because those rules do not conform to the individual judge's philosophical notion as to what the law should be.

I respectfully submit that there comes a time when the minority should recognize that an issue of law has been decided in this state, and that the rule of stare decisis is applicable to a given situation. I recognize that under some circumstances it is proper for a court to overrule a previous decision and this court has indicated under what circumstances it is proper to do so. None of the reasons heretofore given as a basis for the court's action in overruling a previous decision are present in the instant case. The reasons which are generally acceptable as a basis for a refusal to be governed by the rule of stare decisis are considered in *Mountain States Telephone and Telegraph Company v. City and County of Denver, et al.,* 125 Colo. 167, 243 P. (2d) 397, and the cases there cited.

The dissenting opinion quotes from *People v. Schaefer,* 129 Colo. 215, 268 P. (2d) 420, the following language:

"With reference to the rule of stare decisis upon which the administratrix relies, suffice it to say that this is not the first time, nor will it be the last, in which we, for definite and valid reasons, have felt obligated to overrule a former decision. * * *"

Here the quotation abruptly stops. But in the opinion referred to the paragraph, after citing authorities, continues: "Courts are not bound to perpetuate errors merely upon the ground that a previous erroneous decision has been rendered on a given question. If it is wrong, it should not be continued, unless it has been so long the

rule of action, and relied upon to such an extent, that greater injustice and injury will result by a reversal, though wrong, than to observe and follow it."

The dissent places the emphasis on the phrase "nor will it be the last." If I were to place an emphasis upon any selected portion of the full statement I probably would underscore the statement that *"for definite and valid reasons"* this court may disregard the rule of stare decisis. Those reasons which are "definite" and "valid" are not present in the instant case, as will readily appear from reading the decisions cited in the last paragraph of the opinion in *People v. Schaefer,* supra, and a substantial number of other cases cited in *Mountain States Telephone and Telegraph Company,* supra.

The concluding statement in the dissenting opinion of Mr. Chief Justice Frantz points up the area in which I respectfully part company with him. It is there asserted, "I would have Colorado join the ranks of states which repudiate the doctrine of sovereign immunity." (Five states seem to have taken this action.) As a matter of individual opinion I might also be pleased to see Colorado "repudiate" that doctrine. However, if that result is to be reached it should be brought about by that branch of the government which is charged with the legislative duties of creating rights and liabilities, and amending and changing the existing law. It should not be accomplished by a usurpation on the part of the judiciary of a power belonging exclusively to the legislative branch of the government in violation of Article III of the constitution, which provides:

"* * * and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, * * *"

Courts are not arbiters of public policy. We are not here dealing with any of the considerations, governmental, sociological or otherwise with which the age old doctrine of sovereign immunity in tort actions is freight-

ed. Whatever views any of us may entertain as to its historical or philosophical worth, we are here limited both by law and conscience to the judicial function of faithfully interpreting and applying the law as we find it. We cannot usurp the legislative power of establishing public policy.

It is interesting to note that several sessions of the state legislature have convened since a minority of the members of this court opened the war on the doctrine of governmental immunity in actions based upon negligent acts of servants of the state. In *Denver v. Madison,* supra, (January 1960) a dissenting opinion was filed which directed attention to the personal belief of the author that:

"It is a melancholy distortion of the temper of our institutions that the doctrine of immunity ever gained acceptance. Sovereign immunity is just as uncongruous to our way of government as speaking of a squared circle. The reasons for its recognition are baseless, * * *."

This was an honest statement of one judge's opinion. But the legislature, which was then in session, was not impressed thereby and the several legislatures which have since convened have not yet been impressed with the "squared circle" argument or any of the other reasons which have been advanced in subsequent dissenting opinions as being grounds for "repudiation" of the rule.

Although the legislature has considered the question and has made exceptions to the application of the rule in certain cases, it has consistently refused to agree that the general rule should be changed. There are substantial arguments available to those who favor a continuance of the well established rule with which the members of the legislature are thoroughly familiar. Even though these arguments do not persuade the dissenters in this case they carry sufficient weight with the members of the legislature to prevent repeal or "repudiation" of the law as it exists today. When successive legislative sessions come and go without amending or doing away with the rule; when hundreds of county commissioners through

their organization resist a change; when the work of countless members of the boards of school districts throughout the state would be directly affected by a change in the law which would operate retrospectively; when the heavy majority of such board members and many of their constituents are opposed to "repudiation" of the rule on well grounded concepts of public policy; how can it be said with certainty that the rule is so manifestly "unjust" or that it is such an "anachronism" that the judiciary should usurp legislative powers and do away with it?

The majority members of this court have taken the position that the court will not thus usurp the function of the legislative arm of the government. We have repeatedly said with reference to this matter, "It is not not within the province of the judicial branch of the government thus to change long established principles of law. This is a function of the legislature. * * *" *Denver v. Madison,* supra.

I can characterize the course of action advocated in the dissent in no other terms than "judicial legislation." The fact that the legislature has failed to do that which some of the members of this court believe it should do, does not transfer legislative authority to the judiciary to alter the law to conform to the individual opinions of judges with relation to what they think the law should be. Such a course would result in the destruction of our fundamental concept of "government by law," and substitute that of "government by a man, or a few men." Endless uncertainty and confusion would be the result, and with each new arrival upon the appellate bench the previously well established rules would be subject to re-examination to determine whether they "squared" with the motion of the new judge as to what the law should be.

MR. CHIEF JUSTICE FRANTZ dissenting:

The common law of America is evolutionary; it is not

static and immutable. It is in constant growth, going through mutations in adapting itself to changing conditions and in improving and refining doctrine. By its very nature, it seeks perfection in the achievement of justice.

Thus it has been said that courts may reshape ancient rules of the common law so as to fit them to present conditions; verily, it is their duty to keep the common law abreast of changes wrought by time. Courts should not be averse to molding common law principles to meet the dictates of experience and observation. Indeed, it is a sad commentary on the common law if it can be said of it that it cannot profit by the experiences and observations of the past and that thus the present shall always and irrevocably be controlled by the past.

One of the oldest maxims of the common law is "that where the reason of the rule ceased the rule also ceased, and it logically followed that when it occurred to the courts that a particular rule had never been founded upon reason, and that no reason existed in support thereof, that rule likewise ceased, and perhaps another sprang up in its place which was based upon reason and justice as then conceived." *Funk v. United States,* 290 U.S. 371, 54 S.Ct. 212, 78 L. Ed. 369; *Ketelsen v. Stilz,* 184 Ind. 702, 111 N.E. 423. See *Biggerstaff v. Zimmerman,* 108 Colo. 194, 114 P. (2d) 1094; *Rains v. Rains,* 97 Colo. 19, 46 P. (2d) 740; "Collected Legal Papers," Holmes, p. 187; "The Nature of the Judicial Process," Cardozo, p. 152; "A Concise History of the Common Law," Plucknett, 2nd Ed., pp. 272-274. Perhaps the following excerpt from *Funk v. United States,* supra, contains the classic statement concerning the constant evolution of the common law:

"To concede this capacity for growth and change in the common law by drawing 'its inspiration from every fountain of justice,' and at the same time to say that the courts of this country are forever bound to perpetuate such of its rules as, by every reasonable test, are

found to be neither wise nor just, because we have once adopted them as suited to our situation and institutions at a particular time, is to deny to the common law in the place of its adoption a 'flexibility and capacity for growth and adaptation' which was 'the peculiar boast and excellence' of the system in the place of its origin."

I respectfully suggest to my confreres on this Court that in any consideration of the doctrine of stare decisis, we keep a balance between concepts: that in recognizing the merit of stare decisis we not lose sight of the importance of the healthy growth inherent in the common law. As between a resort to stare decisis and a growth in the law which effectuates justice, there should be no dragging of feet once it is ascertained that a true advance in the dispensation of justice and in the science of law can be achieved.

The very subject under consideration reveals the evolutionary process of the common law as this Court has performed its duties day by day.

All will concede that there was a time when the doctrine of sovereign immunity was applied with unanimity by the members of this Court as then constituted in cases involving the doctrine then before it. But during the last decade the doctrine has been much criticized by members of this Court. Indeed, it had apparently been discarded by en banc decisions in three cases. Certain members reject the doctrine insofar as contractual relations with the state are involved, on the theory that by its contract the state has given consent to suit by the other contracting party.

There is thus revealed a condition of unquiet flux on the subject. Where once the doctrine had smooth sailing, it is now rocking along in troubled waters.

In 1952 this Court acting en banc decided the case of *Boxberger v. State Highway Department*, 126 Colo. 438, 250 P. (2d) 1007. The decision was unanimous. It was there said that "the rights of a citizen remain the same whether they collide with an individual or a govern-

ment, and judicial tribunals were wisely established to correct such matters without the individual being relegated to the position of no other remedy except to appeal to a legislature, maybe to no avail, as all the people, or the citizens, are, in fact, the sovereign under our desirable form of government."

The doctrine of sovereign immunity was again considered in *Ace Flying Service, Inc., v. Colorado Dept. of Agriculture,* 136 Colo. 19, 314 P. (2d) 278 (1957). Three opinions were written, revealing a diversity of views among the members of the Court. No majority could be marshalled to act as the voice of the Court in the disposition of that case.

Two months later the Court released its opinion in the case of *Colorado Racing Commission v. Brush Racing Association,* 136 Colo. 279, 316 P. (2d) 582, an en banc decision in which it was said of cases cited by the State of Colorado that they "are outmoded by more recent pronouncements of this Court. In Colorado 'sovereign immunity' may be a proper subject for discussion by students of mythology but finds no haven or refuge in this Court." We decried "the State's archaic contention."

A year and a half later the Court in an en banc opinion, Justice Day not participating, decided the case of *Stone v. Currigan,* 138 Colo. 442, 334 P. (2d) 740 (1959). We there said that the "doctrine of sovereignty in Colorado is in limbo, only the memory lingers on. Sequiturs that emanated from the doctrine such as 'immunity from suit, 'immunity from paying interest,' 'immunity from the statute of limitations,' etc., have with the demise of the doctrine become non-sequiturs."

Then followed four cases in which the majority held that sovereign immunity was still applicable in tort cases. *Denver v. Madison,* 142 Colo. 1, 351 P. (2d) 826; *Liber v. Flor,* 143 Colo. 205, 353 P. (2d) 590; *Faber v. Colorado,* 143 Colo. 240, 353 P. (2d) 609; *Berger v. Dept.*

*of Highways,* 143 Colo. 246, 353 P. (2d) 612 (all handed down in 1960).

Should the doctrine of sovereign immunity prevail in Colorado today? To those who believe that sovereign immunity was adopted as a part of the common law, may I propose that conditions have so changed as to make it an anachronism today. To those who believe it never had a proper place in the American common law (and I am of this opinion, as shown by my several dissents in the cases above cited), my proposal does no violence.

To those who believe that sovereign immunity was a part of our common law, I point out the vast difference in conditions as they exist today as compared with those in being at the time there seemed to be no contention over the application of the doctrine. In former days the theory that the least governed were the best governed was effectuated as a fact. Certainly on both the federal and state levels there was a minimum of control over the lives of citizens in all aspects.

But today the activities of government touch upon every phase of a citizen's life. These activities have become expansive and they affect more and more the lives of all citizens. There is hardly an activity of a citizen which is not colored by some control exercised by government.

The very case that we are now considering involves circumstances wholly different from those existing when sovereign immunity was first the subject of discussion in opinions of this Court. Compulsory education was unknown in the early days of Colorado. Today children must go to school until they reach sixteen years of age. Neither parent nor child has any choice in the matter. Whether there exist hazards at the school to which the pupil is assigned makes no difference. If a child is injured by reason of such hazards, are parents and child helpless because of sovereign

immunity or have they a right of action where the pupil attends under a species of compulsion?

It is my firm belief that sovereign immunity is completely out of tune with conditions as they exist today where governmental activity creeps into all phases of a citizen's life and the citizen's freedom thereby necessarily shrinks so that there are a myriad more chances of being injured by government than there were when sovereign immunity was a doctrine in swaddling clothes in this state.

This doctrine should go the way of other principles of old English law which outlived their usefulness or which became outmoded by reason of change. It should go the way of such principles as compurgation, feoffment, the doctrine that a husband may inflict corporal punishment upon his wife, primogeniture, the importance of seals to documents, wergild, attornment by tenants, to mention but a few doctrines that have fallen by the wayside in the evolutionary progress of the common law.

This Court has said in respect to stare decisis that "above and beyond all this is the more important question of being right, and unless there is some particular reason why an erroneous ruling should be followed no court should be above reversing itself when it has been clearly demonstrated that it has made a mistake in one of its conclusions * * *; in such case the precedent should not be blindly followed simply because it has been announced." *Imperial Securities Company v. Morris*, 57 Colo. 194, 141 Pac. 1160.

I am in accord with the statement of this Court in *People ex rel. v. Denver*, 125 Colo. 167, 243 P. (2d) 397, and believe it sustains my view of sovereign immunity. The Court said that "it is *universally recognized* that, notwithstanding the rule of stare decisis and the inclination to follow precedent, the courts of last resort have the power, and it sometimes is their duty, in *serving the interests of justice,* to depart from rules previously

established by court decision." (Emphasis supplied.) See *Cooper Motors v. Comm'rs,* 131 Colo. 78, 279 P. (2d) 685.

I say a devout "Amen" to this excerpt from an opinion of this Court in the case of *People v. Schaefer,* 129 Colo. 215, 268 P. (2d) 420: "With reference to the rule of stare decisis upon which the administratrix relies, suffice it to say that this is not the first time, *nor will it be the last,* in which we, for definite and valid reasons, have felt obligated to overrule a former decision." (Emphasis supplied.)

During the last decade the members of this Court have spoken with many tongues regarding sovereign immunity. The Court has not, nor have its individual members, been wholly consistent in the statement of views on this subject. To me this unsettled condition is symptomatic of the evolutionary process — a judicial ferment regarding an unsound condition in the law — so typical of the common law, and which is truly its greatest glory.

I fondly hope that a strabismal outlook concerning sovereign immunity will some day be overcome; that those who subscribe to the theory that sovereign immunity is part of our law will recognize that the more frequently governments impinge on individual citizens the more chances there are for governments to hurt citizens, and that therefore governments of necessity must become subject to liability for injuries.

Governmental immunity has been under attack in a number of states during the last few years. It is moribund or dead as the result of decisions in states which have recently weighed its merits. Oddly enough, opinions of this Court have been used as persuasive authority for repudiating the doctrine, as revealed by reading *Muskopf v. Corning Hospital District,* 55 Cal. (2d) 211, 359 P. (2d) 457 (1961); *Spanel v. Mounds View School District,* 264 Minn. 279, 118 N.W. (2d) 795

(1962); *Stone v. Arizona Highway Commission,* 93 Ariz. 384, 381 P. (2d) 107 (April 1963).

In 1957 in the case of *Hargrove v. Town of Cocoa Beach,* (Fla.) 96 So. (2d) 130, 60 A.L.R. (2d) 1193, the first serious recent break with the past regarding the doctrine of sovereign immunity was made. The Court reasoned that "[j]udicial consistency loses its virtue when it is degraded by the vice of injustice." Since then the doctrine has been repudiated in a number of jurisdictions. *Molitor v. Kaneland Community Unit District No. 302,* 18 Ill. (2d) 11, 163 N.E. (2d) 89, 86 A.L.R. (2d) 469, 14 N.C.C.A. (3rd) 409 (1959); *Muskopf v. Corning Hospital District,* supra; *Williams v. City of Detroit,* 364 Mich. 231, 111 N.W. (2d) 1; *Holytz v. City of Milwaukee,* 17 Wis. (2d) 26, 115 N.W. (2d) 618; *Spanel v. Mounds View School District,* supra; *Stone v. Arizona Highway Commission,* supra.

I believe that most of these cases speak eloquently and with irresistible logic in rejecting governmental immunity. It is difficult to resist the temptation to quote from these decisions. Perhaps the opinion of Judge Traynor, as he spoke for the Supreme Court of California in the case of *Muskopf v. Corning Hospital District,* supra, is the most persuasive.

Forthrightly it is declared by the California Supreme Court that "[a]fter a re-evaluation of the rule of governmental immunity from tort liability we have concluded that it must be discarded as mistaken and unjust."

In thus repudiating the doctrine, Justice Traynor observed that "[t]he rule of governmental immunity for tort is an anachronism, without rational basis, and has existed only by the force of inertia."

Surprisingly, according to Judge Traynor:

"At the earliest common law the doctrine of 'sovereign immunity did not produce the harsh results it does today. It was a rule that allowed substantial relief. It began as the personal prerogative of the king, gained

impetus from sixteenth century metaphysical concepts, may have been based on the misreading of an ancient maxim, and only rarely had the effect of completely denying compensation. How it became in the United States the basis for a rule that the federal and state governments did not have to answer for their torts has been called 'one of the mysteries of legal evolution.'"

This quotation has particular application to the theme of this dissent. Early use of the doctrine was so rare as to have little adverse effect, but today, with federal and state government touching all phases of a citizen's life, it does have an unjust and harsh effect.

Of additional interest is the comment of Judge Traynor that the doctrine's origin as part of the American common law is so obscure as to be a mystery of "legal evolution."

I would have Colorado join the ranks of states which repudiate the doctrine of sovereign immunity. Various reasons are adopted for repudiation. Some decisions adopt one or more of these reasons, but they all indicate that in present day America the doctrine is an anachronism.

An unjust error does not ripen into something that is right merely because repeatedly committed. Stare decisis thus enshrined is a false legal idol to which I refuse to bend my knee. Forty decisions, more or less (I have never counted them), erroneously enunciating a doctrine having its genesis and raison d'etre in absolutism, a concept wholly foreign to our way of government, do not by repetition inject the doctrine with vitality and validity. One does not gather "figs off thistles."