## No. C-728

### Lorene Blackwell v. Armando Del Bosco

(558 P.2d 563)

Decided August 3, 1976.

Michael J. Wood, for petitioner.

Robert W. LaBree, P.C., for respondent.

Michael Gilbert, Jon S. Nichols, for amici curiae Legal Aid Society of Metropolitan Denver, Inc.

Jonathan D. Asher, for amici curiae Colorado Rural Legal Services, Inc.

*En Banc.*

MR. JUSTICE LEE delivered the opinion of the Court.

This case presents the question of whether in Colorado an implied warranty of habitability arises as a consequence of the landlord-tenant relationship. The court of appeals, in affirming the trial court's ruling, held that such a warranty does not exist, *Blackwell v. Del Bosco*, 35 Colo. App. 399, 536 P.2d 838. We granted certiorari to review this determination and we now affirm.

I.

In March 1971, respondent purchased an existing car dealership and the tract of land on which it was located, on South Weber Street, in Colorado Springs. Among the improvements was a run-down one-bedroom house, which was occupied by petitioner who had been paying a monthly rental of sixty-five dollars to the previous owner. Petitioner was a widow approaching sixty years of age, whose monthly income totalled $123. Respondent permitted petitioner to continue the month-to-month tenancy at the same monthly rental. Petitioner remained in possession until November 1973.

Respondent testified that he intended to eventually tear the house down in order to expand his used car lot. He advised petitioner of his intentions and told her that he hoped she could find another place to live. He also told her that he did not intend to make any repairs. However, he allowed petitioner to continue occupancy for over two years, and on occasion he or his agents attempted minor repairs.

The record establishes, and respondent concedes, that the house in question was in wretched condition. A municipal building inspector who inspected it in September 1973 characterized it as unfit for human habitation. The building inspector gave respondent sixty days to correct the deficiencies and informed him that if the corrections were not remedied within this period occupancy of the dwelling would become unlawful.

In August 1973, petitioner commenced to withhold rent payments because of respondent's refusal to make certain repairs which she alleged he had promised. Rather than repair the house to bring it up to the minimal level required for compliance with the housing code, which it was estimated would cost thousands of dollars, respondent brought, on November 5, 1973, a forcible entry and detainer (FED) action in the El Paso County

court against petitioner, demanding return of the premises and payment of the rent withheld. This action was later transferred to the district court.

On November 13, 1973, petitioner filed an action in the El Paso County district court, seeking in the first claim to recover rents paid during the tenancy, in the sum of $1,885, and in the second claim damages of $5,000 for the alleged infliction of intentional emotional distress caused by respondent's "outrageous conduct."

Respondent's FED action was heard on November 20, 1973, at the conclusion of which petitioner was ordered to vacate the premises. No appeal was taken from that ruling.

Trial of petitioner's claims was to a jury, and commenced on May 7, 1974. At the conclusion of petitioner's case, the court granted respondent's motion to dismiss both claims for relief. The court found that the landlord had not expressly or impliedly warranted the dwelling to be habitable and that the tenant had not given proper notification of such defects as did exist. The record supports these findings. The court of appeals affirmed the trial court's rulings. Petitioner does not, on certiorari, seek review of the court of appeals' affirmance of the dismissal of the second claim relating to the alleged intentional infliction of emotional distress.

## II.

■ Under the common law rule, which evolved from an agrarian society in medieval England, all leases were subject to the doctrine of caveat emptor. A lessor by merely leasing did not covenant or warrant that the premises were tenantable or fit for the lessee's intended use. Thus, in the absence of an express warranty or of fraud or misrepresentation, the lessee took the premises in the condition he found them, with all existing defects of which he knew or could have ascertained upon reasonable inspection. Quinn & Phillips, *The Law of Landlord-Tenant: A Critical Evaluation of the Past With Guidelines for the Future*, 38 Fordham L. Rev. 225 (1969); 49 Am. Jur. 2d *Landlord and Tenant* § 768. "[F]raud apart," it was said, "there is no law against letting a tumbledown house. * * *" *Robbins v. Jones*, 15 C.B. (N.S.) 221, 143 Eng. Rep. 768 (1863).

This court has basically adhered to the common law rule with respect to leases of both a business and a residential nature. In *Davis v. Marr*, 160 Colo. 27, 413 P.2d 707, it was stated:

"Generally, when a prospective tenant has had an opportunity to inspect the condition of the premises sought to be rented, and any defects existing thereon are patent or obvious to the tenant's observation, the law exempts the landlord from liability for injuries * * *. In the absence of the landlord's covenant to repair, the tenant is said to have assumed the risk of loss or injury when he enters into the defective premises and has had means of information equal to that of the landlord. * * *"

To the same effect is *Capitol Co. v. Anheuser-Busch*, 94 Colo. 372, 30 P.2d 264, where, said the court, the ordinary rule is that there is no

implied warranty on the part of the lessor that the premises, as leased, are safe for occupation by the tenant.

In *Spicer v. Machette*, 59 Colo. 214, 147 P. 657, the court said that in a lease for a building there is no implied contract that it is well constructed, or safe, or reasonably fit for occupancy, or that it will continue in habitable condition. Absent an express agreement, if the tenant has equal information with his lessor, the lessor is not liable for losses sustained due to defective or dangerous conditions.

Consistent with the foregoing rule are also: *Baughman v. Cosler*, 169 Colo. 534, 459 P.2d 294; *Martin v. Grant*, 90 Colo. 300, 8 P.2d 764; *Colorado Co. v. Giacomini*, 55 Colo. 540, 136 P. 1039; *Davidson v. Fischer*, 11 Colo. 583, 19 P. 652; *Thum v. Rhodes*, 12 Colo. App. 245, 55 P. 264.[1]

### III.

The sometimes harshness of the common law rule, which led this and other courts to establish exceptions to it, has also led an increasing number of courts in recent years to treat the residential lease as a contract and to imply a warranty that the living unit is "habitable." Courts have recognized that tenants today are typically short-term and have neither the tools nor skills to make needed repairs, which repairs may well cost more than the average tenant can afford. Furthermore, there is often unequal bargaining power between landlord and tenant, 2 *M. Friedman, Friedman on Leases* § 10.101. The tenant, even if he inspects before signing a lease, may not be able to discover hidden defects.

For these reasons, a number of jurisdictions have rejected the common law doctrine of caveat emptor: *Javins v. First National Realty Corporation*, 138 D.C. App. 369, 428 F.2d 1071 (D.C. Cir. 1970), *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185; *Lemle v. Breeden*, 51 Hawaii 426, 462 P.2d 470, 40 A.L.R.3d 637; *Mease v. Fox*, 200 N.W.2d 791 (Iowa 1972); *Steele v. Latimer*, 214 Kan. 329, 521 P.2d 304; *Boston Housing Authority v. Hemingway*, 293 N.E.2d 831 (Mass. 1973); *King v. Moorehead*, 495 S.W.2d 65 (Mo. App. 1973); *Marini v. Ireland*, 56 N.J. 130, 265 A.2d 526, 40 A.L.R.2d 1356; *Pines v. Perssion*, 14 Wis.2d 590, 111 N.W.2d 409; *see also* Annot., 40 A.L.R.3d 646.

In addition to the foregoing policy reasons, the courts have been guided by the existence of housing codes and warranties implied in other areas of the law. The *Javins* case, *supra*, held that the warrant could be implied independently on the basis of a housing code, and reliance has

---

[1]Several exceptions, however, have been established in this state to the rule of caveat emptor, *see Giacomini, supra*, where the property, a hotel, was leased for those purposes; *see also Capitol Co. v. Anheuser-Busch, supra*, where the defect was allegedly unknown to the tenant, was known to the landlord, and was not ascertainable upon ordinary inspection, and *Davis v. Marr, supra*, where the landlord had covenanted to repair the defect.

been placed by analogy on the trend in a growing number of states to imply warranties in sales of new homes[2] and in the Uniform Commercial Code implied warranties of merchantability and fitness for a particular purpose, *see Lemle v. Breeden, supra.*

We have carefully considered the emerging warranty remedy recognized in these opinions. We have concluded that, however desirable the adoption of the rule of implied warranty of habitability might be, the resolution of this issue is more properly the function of the General Assembly. We recognize that the rule of caveat emptor was developed under social and economic conditions which no longer prevail in many areas of the United States. But the implied warranty of habitability theory involves many economic and social complexities, and we believe its adoption should be preceded by the research and study of which the legislature is more capable. Embracing the theory might, for example, cause landlords to significantly raise rents in order to make the required repairs, or induce them to abandon already run-down premises, leaving some poor people without any place, good or bad, in which to live. Indeed, in the present case, respondent preferred to evict the petitioner rather than invest great sums in repairs.

We note, further, that the courts which have adopted the implied warranty remedy have not expressed agreement on what form it is to take — by what standards breach of warranty is to be measured, whether it may be waived or disclaimed, or what measure of damages should be available to the aggrieved tenant. These considerations, the formulation of which will vastly affect the rental industry, in our view, lie within the legislative competence of the General Assembly.

For the foregoing reasons, the judgment of the court of appeals is affirmed.

MR. CHIEF JUSTICE PRINGLE dissents.

MR. CHIEF JUSTICE PRINGLE dissenting:

I most respectfully dissent. I do not believe that an outworn common law doctrine should be retained in the law of this state in the hope that the legislature will act in that area. Had the legislature acted in whatever way, I would, of course, recognize and adhere to their power in this area. But in the absence of their action in the field, I think it wrong to rely, as I said, on an outmoded common law doctrine. The strength of the common law always was its responsiveness to the changing needs of society.

---

[2]This trend is exemplified by this court's decision in *Carpenter v. Donohoe*, 154 Colo. 78, 388 P.2d 399; *see also Schipper v. Levitt & Sons, Inc.*, 44 N.J. 70, 207 A.2d 314; Comment, 20 De Paul L. Rev. 955 (1971).

In *Evans v. Board of County Commissioners*, 174 Colo. 97, 482 P.2d 968 (1971), this court eliminated the doctrine of sovereign immunity in Colorado. The doctrine had been applied throughout 85 years of court decisions. The court, in justifying the decision stated:

". . . We think that *Constitutionality of Substitute* and *Bish*, the two cornerstones of sovereign and governmental immunity in Colorado, were wrong when announced and they are wrong today; repetition of them forty times or four hundred times doesn't make good law or cause the reasons for the doctrines to become any stronger. In any event, if the doctrines were not wrong when some or all of these decisions were written, they are now." 482 P.2d 972.

The court stated that one reason for eliminating sovereign immunity was that social and economic and political conditions were greatly different in 1971 than they were in the time of the English Tudors. Compare, page 565 of the majority opinion in *Blackwell*, where the court concedes that the doctrine of *caveat emptor* was created in a time of different social and economic conditions. *See also Javins v. 1st Nat. Realty Corp.*, 138 U.S. App. D.C. 369, 428 F.2d 1071 (1970).

It has been said by the great Justice Holmes that

"It is revolting to have no better reason for the rule of law than that so it was laid down in the time of Henry IV. It is still more revolting, if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." Holmes, Collected Legal Papers, p. 187.

And in Kent's Commentaries, Lecture XXI (14th ed. 1896) we find the following:

"It is impossible that the fabric of our jurisprudence should not exhibit deep traces of the progress of society, as well as of the footsteps of time."

The former Chief Justice Frantz, in speaking of this principle, said in his dissent to the majority in *Tesone v. School District*, 152 Colo. 596, 384 P.2d 82 (1963):

"Thus it has been said that courts may reshape ancient rules of the common law so as to fit them to present conditions; verily, it is their duty to keep the common law abreast of changes wrought by time. Courts should not be averse to molding common law principles to meet the dictates of experience and observation. Indeed, it is a sad commentary on the common law if it can be said of it that it cannot profit by the experiences and observations of the past and that thus the present shall always and irrevocably be controlled by the past." 384 P.2d at 86.
* * * *

"This doctrine should go the way of other principles of old English law which outlived their usefulness or which became outmoded by reason of change. It should go the way of such principles as compurgation, feoffment, the doctrine that a husband may inflict corporal punishment

upon his wife . . . to mention but a few doctrines that have fallen by the wayside in the evolutionary progress of the common law.

"This Court has said in respect to stare decisis that 'above and beyond all this is the more important question of being right, and, unless there is some particular reason why an erroneous ruling should be followed, no court should be above reversing itself when it has been clearly demonstrated that it has made a mistake in one of its conclusions * * *; in such case the precedent should not be blindly followed simply because it has been announced.' *Imperial Securities Company v. Morris*, 57 Colo. 194, 141 P. 1160." 384 P.2d at 88.

As the majority opinion in this case indicates, an increasing number of courts have recently adopted the doctrine of implied warranty of habitability. The leading case of *Javins, supra*, enumerates the compelling reasons for adopting the implied warranty:

"The assumption of landlord-tenant law, derived from feudal property law, that a lease primarily conveyed to the tenant an interest in land may have been reasonable in a rural, agrarian society; it may continue to be reasonable in some leases involving farming or commercial land. In these cases, the value of the lease to the tenant is the land itself. But in the case of the modern apartment dweller, the value of the land is that it gives him a place to live. The city dweller who seeks to lease an apartment on the third floor of a tenement has little interest in the land 30 or 40 feet below, or even in the bare right to possession within the four walls of his apartment. When American city dwellers, both rich and poor, seek 'shelter' today, they seek a well known package of goods and services — a package which includes not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation and proper maintenance." 428 F.2d at 1074.

The *Javins* opinion further noted that builders of new homes recently have been held liable to purchasers for improper construction on the ground that an implied warranty of fitness had been breached. *See Carpenter v. Donohoe*, 154 Colo. 78, 388 P.2d 399 (1964).

In *Green v. Superior Court*, 10 Cal. 3rd 616, 111 Cal. Rptr. 704, 517 P.2d 1168 (1974), the California Supreme Court wrote at length in discarding, in favor of an implied warranty of habitability, the common law doctrine that a landlord owed no duty to his tenant to keep leased premises in a habitable condition. It pointed out that the doctrine of *caveat emptor* which applied during free market days no longer served as a viable means for fairly allocating the duty to repair leased premises between landlord and tenant. The doctrine of *caveat emptor* has been wiped out in many other areas of the commercial law and an implied warranty of fitness adopted. The common law doctrine of *caveat emptor* in the landlord tenant field ought to go as well and, unless constrained by legislative act, I would do it.

The problems envisioned by the majority opinion seem to be substantially exaggerated. In several recent law review articles dealing with the economic effects of implied warranties of habitability, it has been found that while there has been some abandonment of residential dwelling units by landlords, this abandonment has not been widespread and has not drastically affected the availability of low income housing.

Furthermore, cases and articles have discussed and offered viable methods for determining a tenant's damages in cases where the implied warranty of habitability has been breached. *See* Note, An Assessment of the Impact of an Implied Warranty of Habitability in New York State, 24 Buffalo L. Rev. 189 (1974); Moskovitz, The Implied Warranty of Habitability: A New Doctrine Raising New Issues, 62 Calif. L. Rev. 1444 (1974).